Argued and submitted August 30, 1979,
remanded February 19,
reconsideration denied April 1,
appellant's petition for review and
respondents' petition for review allowed May 1, 1980

STATE OF OREGON,
*Appellant,*
*v.*
LEO ALEXANDER,
*Respondent.*

(Nos. G-77-104; G 78-43;
G-78-44; G-78-45, CA 13568)

STATE OF OREGON,
*Appellant,*
*v.*
CLIFFORD ALEXANDER,
*Respondent.*

(Nos. G-77-103; G-78-39;
G-78-40; G-78-41, CA 13568)

STATE OF OREGON,
*Appellant,*
*v.*
MICHAEL A. BRISBOIS,
*Respondent.*

(Nos. G-77-105; G-78-46;
G-78-47; G-78-48, CA 13568)

(cases consolidated)

607 P2d 181

[557]

Robert C. Cannon, Assistant Attorney General, Salem, argued the cause for appellants. With him on the briefs were James A. Redden, Attorney General, and Walter L. Barrie, Solicitor General, Salem.

Edward J. Jones, Oregon City, argued the cause and filed the brief for respondents.

Before Buttler, Presiding Judge, and Gillette and Roberts, Judges.

BUTTLER, P. J.

ROBERTS, J., dissenting opinion.

**BUTTLER, P. J.**

In these cases, which were consolidated below, the defendants, who claim to be enrolled members of the Yakima tribe, were cited by both Washington and Oregon authorities for allegedly violating a variety of statutes which regulate fishing. Oregon authorities cited each defendant for fishing during a closed season, *see* ORS 506.129, ORS 509.011(1)(c), OAR 635-35-200, operating a set net during a closed season, *see* ORS 509.011(1)(b), OAR 635-35-025(3), illegally possessing food fish during a closed season, *see* ORS 509.006, ORS 509.011(1)(a), OAR 635-35-200, and fishing with an unidentified set net, *see* ORS 506.129(1)(b), OAR 635-35-050(5).[1]

While the record does not disclose clearly whether each defendant was cited for more than one violation of Washington fishing laws, the parties agree that each defendant was cited and prosecuted for violating RCW 77.16.030, which prohibits the possession of a game fish during a closed season. In December, 1977, each of the defendants was convicted in Washington of that offense and, perhaps, other fishing offenses.

Thereafter, defendants moved to dismiss the Oregon charges on the basis of former jeopardy. The state appeals from an order granting that motion and dismissing all of the Oregon charges.

The trial court found that all of the fishing violations charged by both Washington and Oregon arose out of the defendants' conduct on the Columbia River during the early morning hours of July 12, 1977, that all of them arose out of the same transaction, or criminal episode, *see* ORS 131.505(4), and that all of

---

[1] OAR 635-35-050(5), which applies to individuals possessing certain Indian treaty fishing rights, *see* OAR 635-35-005(1), provides that it is unlawful to,

> "Use or operate any gill net, setnet, or hoop net which does not have the tribal affiliation and tribal enrollment number of the owner of the net placed upon or adjacent to each end cork or float of the gill net or setnet and upon the upper side of the hoop net."

them were misdemeanors. In deciding that former jeopardy precluded Oregon from proceeding against defendants, the trial court apparently applied the principles enunciated in *State v. Brown*, 262 Or 442, 497 P2d 1191 (1972), as urged by defendants, even though the charges arising out of the same transaction could not have been tried in the same court in Oregon. We disagree with that analysis and, while the result reached by the trial court may be correct, we cannot make that determination on this record. For reasons hereinafter stated, we remand these cases for further proceedings.

## THE PROBLEM

In the typical former jeopardy case an offense is committed within the legislative and territorial jurisdiction of one or more sovereigns in violation of an applicable law. The question in those cases is whether the defendant may be prosecuted by both sovereigns; the answers, discussed below, have been different depending on the relationship between the two sovereigns.

But that is not the situation here. We do not know whether the offenses occurred within the state of Washington or the state of Oregon, but only that they occurred on the Columbia River, which forms the boundary between the two states. In the absence of an overriding federal act curing the problem, only the state in which the offenses occurred would have jurisdiction to prosecute the offender. In many cases the locus of the offense may be established clearly as being in one state or the other, but where, as here, the boundary is a river channel which is subject to change, the problem could become insurmountable. As an apparent curative, the Oregon Admission Act and the act organizing the Territory of Washington grant concurrent jurisdiction to Oregon and Washington over all offenses committed on the Columbia River where it forms a common boundary between the two.

The state contends that the "dual sovereign" line of authority controls and the constitutional prohibition

against double jeopardy[2] does not apply: both sovereigns may prosecute defendants. Defendants contend that where, as here, two states are involved, the "dual sovereign" rule is inapplicable and, once they were prosecuted by the state of Washington, all charges arising out of the same transaction or criminal episode are barred under *State v. Brown, supra*, as falling within the protection against double, or former, jeopardy. We conclude that the answer lies somewhere between and depends on whether the Oregon Admissions Act permits prosecution by each state under the circumstances of these cases.

## DUAL SOVEREIGNTY

The United States Supreme Court has not decided whether the prosecution of the same offense by two states constitutes double jeopardy within the meaning of the Fifth Amendment to the United States Constitution. The state relies on a variety of federal cases for the proposition that "prosecutions under the laws of separate sovereigns do not, in the language of the Fifth Amendment, 'subject [the defendant] for the same offense to be twice put in jeopardy.' " *United States v. Wheeler*, 435 US 313, 317, 98 S Ct 1079, 55 L Ed 2d 303 (1978). The federal doctrine, upon which the state relies, is known as the "dual sovereignty" rule. The rationale of the rule has been expressed as follows:

> " 'An offence, in its legal signification, means the transgression of law * * *. Every citizen of the United States is also a citizen of a State or territory. He may be said to owe allegiance to two sovereigns, and may

---

[2] The Fifth Amendment to the United States Constitution provides:

"* * * [N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb; * * *."

The Fifth Amendment applies to the states through the Fourteenth Amendment. *Benton v. Maryland*, 395 US 784, 89 S Ct 2056, 23 L Ed 2d 707 (1969).

Article I, section 12 of the Oregon Constitution provides:

"No person shall be put in jeopardy twice for the same offence * * *."

be liable to punishment for an infraction of the laws of either. The same act may be an offense or transgression of the laws of both * * *. That either or both may (if they see fit) punish such an offender, cannot be doubted. Yet it cannot be truly averred that the offender has been twice punished for the same offence; but only that by one act he has committed two offences, for each of which he is justly punishable.' *Moore v. Illinois*, 14 How 13, 19-20, [14 L Ed 306.]" *United States v. Wheeler, supra,* 435 US at 317.[3]

Applying the "dual sovereignty" rule, the United States Supreme Court has held that "* * * a federal prosecution does not bar a subsequent state prosecution of the same person for the same acts, and a state

[3] The Supreme Court also has noted that " 'undesirable consequences' " may result from imposing the bar of double jeopardy where two sovereigns both seek to prosecute a defendant for a single act. "Prosecution by one sovereign for a relatively minor offense might bar prosecution by the other for a much graver one, thus effectively depriving the latter of the right to enforce its own laws." *United States v. Wheeler, supra,* 435 US at 318; *see also Abbate v. United States,* 359 US 187, 197, 79 S Ct 666, 3 L Ed 2d 729 (1959).

The "dual sovereignty" rule may have originated in, and reflect the Supreme Court's concern with the dynamics of the federal system. One commentator has observed that

"* * * it is not surprising that concern with federalism would prevail over the right to plead double jeopardy. Justice Frankfurter [in *Bartkus v. Illinois,* 359 US 121, 79 S Ct 676, 3 L Ed 2d 684 (1959),] was faced with a conflict between the fifth and tenth amendments and sensitively preferred the latter, an act of judicial statesmanship. Justice Brennan, writing in *Abbate v. United States,* a companion case to *Bartkus,* discerned the policy issues at stake. He thought that the danger of multiple prosecution was outweighed by the necessities of the federal system * * *." Sigler, Double Jeopardy, at 59 (1969).

Writing in dissent, Justice Black has criticized the "dual sovereignty" doctrine as follows:

"The Court apparently takes the position that a second trial for the same act is somehow less offensive if one of the trials is conducted by the Federal Government and the other by a State. Looked at from the standpoint of the individual who is being prosecuted, this notion is too subtle for me to grasp. If double punishment is what is feared, it hurts no less for two 'Sovereigns' to inflict it than for one. If danger to the innocent is emphasized, that danger is surely no less when the power of State and Federal Governments is brought to bear on one man in two trials, than when one of these 'Sovereigns' proceeds alone. In each case, inescapably, a man is forced to face danger twice for the same conduct." *Bartkus v. Illinois, supra,* 359 US at 155; *see also Abbate v. United States, supra,* 359 US at 202 (Black, J., dissenting).

prosecution does not bar a federal one." *Ibid.* (Footnote omitted.) *Bartkus v. Illinois,* 359 US 121, 79 S Ct 676, 3 L Ed 2d 684 (1959); *Abbate v. United States,* 359 US 187, 79 S Ct 666, 3 L Ed 2d 729 (1959); *see also United States v. Lanza,* 260 US 377, 43 S Ct 141, 67 L Ed 314 (1922). The Court also has held that the Navajo Tribe and the United States are separate sovereigns so that a tribal prosecution does not bar a subsequent federal prosecution growing out of the same incident. *United States v. Wheeler, supra.*

However, the Court in *Wheeler* noted that "[t]he 'dual sovereignty' concept does not apply * * * in every instance where successive cases are brought by nominally different prosecuting entities." 435 US at 318. For example, that Court has held that a federal court and a territorial court, and a city and the state of which it is a political subdivision are not "dual sovereigns." *Grafton v. United States,* 206 US 333, 27 S Ct 749, 51 L Ed 1084 (1907); *Puerto Rico v. Shell Co.,* 302 US 253, 58 S Ct 167, 82 L Ed 235 (1937); *Waller v. Florida,* 397 US 387, 90 S Ct 1184, 25 L Ed 2d 435 (1970).

The United States Supreme Court has not ruled on whether the "dual sovereignty" doctrine applies when two states have concurrent jurisdiction over a boundary river and both states seek to prosecute for a single offense. A reasonable argument may be made that within the federal union the delicate relationship between states is more analogous to the federal-state relationship than it is to a state's relationship to its local municipalities, and therefore the same dual sovereignty rule should apply, permitting multiple prosecutions. However, we need not decide that question if we can resolve the problem short of the constitutional issue.

Accordingly, we look to the Admission Act for a possible solution.

### CONCURRENT JURISDICTION

As stated above, the two states' concurrent jurisdiction over offenses committed on the Columbia River

originated in the Oregon Admission Act and in a federal act organizing the Washington Territory.[4] If those acts are construed to permit either state to prosecute an offender for the same offense committed on the river, but once one of the states has exercised its jurisdiction the other may not thereafter prosecute the offender, it is not necessary to reach the double jeopardy constitutional issue.

In *Nielsen v. Oregon*, 212 US 315, 320, 29 S Ct 383, 53 L Ed 528 (1909), which discusses concurrent jurisdiction of Oregon and Washington over the Columbia, the Supreme Court said that,

"Undoubtedly one purpose, perhaps the primary purpose, in the grant of concurrent jurisdiction was to avoid any nice question as to whether a criminal act sought to be prosecuted was committed on one side or the other of the exact boundary in the channel, that boundary sometimes changing by reason of the shifting of the channel. * * *"

This view of the purpose of concurrent jurisdiction over a boundary river seems to be the common one. In *State v. Holden*, 46 NJ 361, 363, 217 A2d 132, 133 (1966) (which deals with the concurrent jurisdiction of New Jersey and Pennsylvania over a bridge spanning the Delaware River) the Court noted:

"The doctrine of concurrent jurisdiction has a long history and obvious purposes. See *Rorer, Interstate Law* 336 (1870); 22 *CJS Criminal Law*, § 137 (1961).

---

[4] Section 1 of the Oregon Admission Act (11 Stat at Large 383; 1859) first describes the boundaries of the state and then provides that the state includes "* * * jurisdiction in civil and criminal cases upon the Columbia River and Snake River, concurrently with States and Territories of which these rivers form a boundary in common with this State."

Section 2 states "[t]hat the said State of Oregon shall have concurrent jurisdiction on the Columbia and all other rivers and waters bordering on the said State of Oregon, so far as the same shall form a common boundary to said State, and any other State or States now or hereafter to be formed or bounded by the same; * * *."

The act organizing the territory of Washington (10 Stat at Large 172; 1853) contains a very similar provision. Section 21 of that act provides: "* * * that the territory of Oregon and the territory of Washington shall have concurrent jurisdiction over all offenses committed on the Columbia River, where said river forms a common boundary between said territories."

See also ORS 507.010—507.030.

Technical and jurisdictional defenses might be available to criminals where their offenses were committed in disputed boundary territory or on boundary waters; to avoid this, the states often entered into agreements which contemplated that either state could prosecute under its own laws for any offense committed in the disputed territory or on the waters. * * *"

*See also State v. Alexander, et al.*, 222 Ark 376, 259 SW2d 677, 679 (1953); *State v. George*, 60 Minn 503, 506, 63 NW 100, 101 (1895) ("* * * One of the reasons for establishing this concurrent jurisdiction [over the Mississippi River] was to prevent the escape of criminals on account of the uncertainty that so frequently arises as to whether the act was committed on one side of the middle of the main channel or the other side of it. * * *"); *State v. Cunningham*, 102 Miss 237, 59 So 76, 83 (1912); 1 Wharton's Criminal Procedure 21, n 62 at 73 (12th ed; 1974); Rorer, Interstate Law at 439 (2d ed; 1893).

In *Nielsen v. Oregon, supra*, the United States Supreme Court stated by way of dictum:

"* * * Where an act is *malum in se* prohibited and punishable by the laws of both States, the one first acquiring jurisdiction of the person may prosecute the offense, and its judgment is a finality in both States, so that one convicted or acquitted in the courts of one State cannot be prosecuted for the same offense in the courts of the other. * * *"[5] 212 US at 320.

*See also State v. Smith*, 101 Or 127, 149, 199 P 194, 16 ALR 1220 (1921); *State v. Holden, supra*, 217 A2d at 134; *State v. Cunningham, supra*, 59 So at 83; 1 Wharton, *supra*, at 4; Rorer, *supra* at 439.

---

[5] This statement is *dictum*. In *Nielsen*, the precise issue was whether Oregon's concurrent jurisdiction with Washington over the Columbia River gave Oregon the authority to convict a Washington resident, who was fishing with a purse seine on the Washington side of the river pursuant to a Washington permit, of the Oregon offense of fishing with a purse seine. The Court held that Oregon's concurrent jurisdiction did not authorize it to "* * * practically override the legislation of Washington, and punish a man for doing within the territorial limits of Washington an act which that State had specially authorized him to do." 222 US at 321.

Although the quoted language of *Nielsen* is dictum and speaks of acts *malum in se* (not involved here), the court's interpretation of the grant of concurrent jurisdiction appears to us to be the most reasonable one. The purpose of the grant is "* * * to avoid any nice question as to whether a criminal act sought to be prosecuted was committed on one side or the other of the exact boundary of the channel * * *," *Nielsen v. Oregon, supra,* 222 US at 320. In other words, the offender is not to be freed because neither state is able to establish that the offense was committed within its boundaries. But after one of the states has prosecuted the offender, the other state may not do so for the same offense. Grants of concurrent jurisdiction were intended to simplify the decision as to which state should exercise its jurisdiction over a crime committed on a boundary river, and not to permit multiple prosecutions.

This interpretation is supported by Rorer, Interstate Law (1870), where the author states:

"Of the matters * * * subject to the concurrent jurisdiction of two states, the court which gets *actual* jurisdiction of the cause, or subject of legal adjudication, prosecution or trial, is entitled to hold the same to a final determination thereof * * *. Moreover, the full and final adjudication thereof upon the merits by such court of concurrent jurisdiction *directly made* is conclusive * * *." *Rorer, supra,* at 439. (Emphasis in original; footnotes omitted.)

We conclude, therefore, that both states may not prosecute defendants for the "same offenses." If any of the Oregon offenses charged is the "same offense" for which defendants were prosecuted in Washington, the Admission Act does not permit Oregon to prosecute defendants therefor.

## SAME OFFENSE

It remains to be determined whether any of the Oregon charges in fact constitute the same offense for which defendants were convicted in Washington.

The former jeopardy statutes, although they might be relevant by analogy, are of no assistance in determining whether the Washington and Oregon charges represent the "same offense," because they do not apply when the charges are brought by different states.[6] Defendants contend, nevertheless, that we should use the "same transaction" or "same criminal episode" test in determining whether multiple charges comprise the same offense.

That test is set out in *State v. Brown, supra,* and is used customarily to determine when multiple charges must be joined in a single trial. ORS 131.515(2), *supra,* note 6; *see also State v. Boyd,* 271 Or 558, 533 P2d 795 (1975); *State v. Bishop,* 16 Or App 310, 518 P2d 177 (1974). The *Brown* test is that

"* * * a second prosecution is for the 'same offense' and is prohibited if (1) the charges arise out of the same act or transaction, and (2) the charges could have been tried in the same court, and (3) the prosecutor knew or reasonably should have known of the facts relevant to the second charge at the time of the original prosecution." 262 Or at 458.

---

[6] ORS 131.515(1) provides that "[n]o person shall be prosecuted twice for the same offense." However, ORS 131.505(5) declares:

"A person is 'prosecuted for an offense' when he is charged therewith by an accusatory instrument filed *in any court of this state or in any court of any political subdivision of this state * * *.*" (Emphasis added.)

ORS 131.515(2) mandates that

"No person shall be separately prosecuted for two or more offenses based upon the same criminal episode, if the several offenses are reasonably known to the appropriate prosecutor at the time of commencement of the first prosecution *and establish proper venue in a single court.*" (Emphasis added.)

The Washington and Oregon charges do not "establish proper venue in a single court."

ORS 131.515(2) restates the *Brown* test in terms of the "same criminal episode," which is defined in ORS 131.505(4):

" 'Criminal episode' means continuous and uninterrupted conduct that establishes at least one offense and is so joined in time, place and circumstances that such conduct is directed to the accomplishment of a single criminal objective."

[567]

By its own terms, this test does not apply to these cases. The Washington and Oregon charges could not have been tried in the same court and we decline to extend the *Brown* "same transaction" test to these cases. The prosecution in Washington of one offense arising out of a single criminal transaction or episode should not bar the prosecution in Oregon of all other offenses arising out of the same transaction when the offenses could not be joined for trial in a single court. As the Court has indicated, the meaning of the phrase "same offense" varies in different contexts. *See State v. Cloutier*, 286 Or 579, 585, 596 P2d 1278 (1979). The *Brown* joinder rule simply does not apply when, as here, all charges cannot be joined.

We look, then, to the "same evidence" test in order to resolve these cases.

"* * * The 'same evidence' test, in the often-quoted language of *Morey v. Commonwealth*, 108 Mass 433, 434 (1871) is

" '* * * not whether the defendant has already been tried twice for the same act, but whether he has been put in jeopardy for the same offense. A single act may be an offense against two statutes; and if each statute requires proof of an additional fact which the other does not, an acquittal, or conviction under either statute does not exempt the defendant from prosecution and punishment under the other.' " *State v. Brown, supra*, 262 Or at 445.[7]

---

[7] This may be a deceptively simple formulation of the same evidence test.

"The author of the Comment, Twice in Jeopardy, 75 Yale L J 262, 273 (1965) has identified several distinct forms of the test in addition to that formulated in *Morey v. Commonwealth*, which he lists as follows: (1) Offenses are the same only if proof of the facts alleged in the second indictment would have been sufficient for a conviction under the allegations of the first indictment [See Rex v. Vandercomb & Abbott, 2 Leach 708, 720, 168 Eng Rep 455, 461 (1796), recognized as the case in which the "same evidence" test originated.]; (2) offenses are not the same unless the defendant could have been convicted of the second offense on the evidence required at the first trial; (3) offenses are not the same if each contains an element not included in the other; (4) offenses are the same only if they are identical in law and in fact." *State v. Brown, supra*, 262 Or at 446, n 10.

In *Brown*, the court rejected the "same evidence" test for the purpose of requiring joinder, but left open the question of whether the "same evidence" test would apply when joinder was not possible, as in these cases. 262 Or at 458-59. The court stressed that it was "* * * convinced that the 'same evidence' test does not provide adequate protection, under modern conditions, from the evils contemplated by the double jeopardy guarantee." 262 Or at 453. The court noted the proliferation of criminal offenses and observed that

> "[i]n such a setting, the traditional 'same evidence' test provides virtually no protection against repeated prosecutions based on a single act or course of conduct. A prosecutor is limited only by the number of ways in which the legislature has made the defendant's conduct punishable, and may indulge in the harassment against which the double jeopardy guarantee should protect. He may split his case, so that if the first trial results in an acquittal he can try the defendant again, for essentially the same conduct, before a different jury or, in case of a conviction, he can prosecute further to obtain what he considers a suitable punishment. He can use the first prosecution as a 'trial run,' planning on refining his case if the first prosecution is unsuccessful. As a consequence, a defendant is deprived of the assurance that an acquittal is the end of the matter or that a conviction and sentence is the final measure of his guilt and punishment. Moreover, repeated prosecutions strain the resources of defendants and dissipate those of the courts and prosecutors, and deprive judgments of their finality. Modern commentators are, for these reasons, justly critical of the 'same evidence' test.[15]

[15.] See, e.g., Sigler, Double Jeopardy, 155 et seq.; Carroway, *Pervasive Multiple Offense Problems—A Policy Analysis,* 1971 Utah L Rev 105; Fisher, *Double Jeopardy Two Sovereignties and The Intruding Constitution,* 28 U Chi L Rev 591, 608-612 (1961); Kirchheimer, *The Act, The Offenses and Double Jeopardy,* 58 Yale L J 513, 527-534 (1949); McElroy, *Double Jeopardy: The Ephemeral Guarantee,* 5 Crim L Bull 375, 387-399 (1969); Comment, note 10 supra, 75 Yale L J at 274; Comment, The Protection From Multiple Trials, 11 Stan L Rev 735 (1959)." 262 Or at 448-50. (Other footnotes omitted.)

It appears highly unlikely to us that the application of the "same evidence" test in the circumstances of this case would create a substantial risk that the types of harassment *Brown* sought to avoid would occur. For example, the prospect that Oregon authorities would conspire with a Washington prosecutor to effectuate a "trial run" does not impress us as one about which we should be concerned. If abuses develop, we will deal with them as and when they arise.

Although other alternatives have not been suggested, we have considered those cases which consider the "same offense" problem when joinder is not an issue. In *State v. Cloutier, supra,* after identifying various distinct "same offense" issues, the Supreme Court stated that

> "* * * we have recognized that the answers to the foregoing operational issues must be sought, first in such legislative directives as do exist; [and] second, in the intentions and policies that may plausibly be attributed to the legislature in the light of legislative history, of the overall statutory framework, and of constitutional principles * * *." 286 Or at 585.

In *State v. Gilbert,* 281 Or 101, 574 P2d 313 (1978), the defendant was indicted for theft in six separate indictments. The defendant was first tried on one of the indictments and acquitted. When the state sought to try the defendant under the other indictments, the defendant claimed that the second trial subjected him to double jeopardy. Joinder was not an issue at the second trial because the defendant had resisted the state's motion to consolidate all charges at the first trial.

That situation presented the "same offense" issue in a context akin to that surrounding the instant cases. The Supreme Court analyzed the issue in *Gilbert* by looking to the specifics of the indictments as matched against the statutory definition of, and the legislative intent as to the perimeters of, the offense of theft. 281 Or at 105-9. Using this methodology, the court determined the number of theft offenses.

Similarly, in *State v. Steele*, 33 Or App 491, 577 P2d 524 (1978), this court determined that separate acts of anal and oral sodomy committed against one victim were distinct offenses so that two sentences could be imposed. Again, the problem was resolved by discerning the legislative intent. 33 Or App at 498-99.

The difficulty with attempting the foregoing analysis here is that in each instance the court is called upon to determine legislative intent from a particular statute or from a statutory scheme. That kind of analysis when dealing with legislation of Washington to determine whether the Washington offense is the same as the Oregon offense does not seem practical or realistic.[8] Therefore, we adopt the same evidence test.

Having determined which test to apply, we are unable to apply it in these cases. As noted above, the state and the defendants disagree as to the number of Washington charges for which each defendant was prosecuted, and our review of the record does not enlighten us. The trial court made no finding on this point. Not being able to make that determination, we cannot match those charges against the Oregon charges to determine which, if any, of the Washington offenses are the same offense in Oregon. Therefore, we must remand to the district court to enter a finding as to the number and the identity of the Washington charges for which each defendant has been prosecuted.

---

[8] However, ORS 507.010 provides that

"* * * there exists between the States of Oregon and Washington a definite compact and agreement, the purport of which is substantially as follows: All laws and regulations now existing, or which may be necessary for regulating, protecting or preserving fish in the waters of the Columbia River, over which the States of Oregon and Washington have concurrent jurisdiction, or any other waters within either of said states, which would affect the concurrent jurisdiction, shall be made, changed, altered and amended in whole or in part, only with the mutual consent and approbation of both states."

This language may reflect the two states' intention to have parallel, analogous laws and regulations concerning fishing which would proscribe the same offenses.

On remand, the Washington charges for which each defendant has been prosecuted should be identified. The specific allegations and the elements of the Oregon and Washington charges should then be compared, with reference to the evidence required to prove each charge, to determine whether any of the Washington offenses is the same as any of the offenses charged under Oregon law. Any offense charged in Oregon which is determined to be the same as a Washington offense for which a defendant has been prosecuted should be dismissed as to that defendant.

Remanded for further proceedings not inconsistent with this opinion.

**ROBERTS, J.,** dissenting.

I dissent from the majority opinion because I conclude that where dual sovereigns, the states of Washington and Oregon, have concurrent jurisdiction each may exercise its own sovereignty in the prosecution of crimes without violating the constitutional prohibition against double jeopardy.

The majority opinion states "we need not decide [the question of dual sovereignty] if we can resolve the problem short of the constitutional issue." (44 Or App at 563.) The decision then resolves the problem by denying Oregon the right to exercise its sovereignty in the prosecution of acts in violation of its laws. I believe we cannot avoid the question of dual sovereignty in this case.

In my opinion the majority erroneously relies on dicta from *Nielsen v. Oregon*, 212 US 315, 320, 29 S Ct 383, 53 L Ed 528 (1909), for the proposition that the prosecution of an offense in one state prevents the prosecution for the same offense in another. The facts in *Nielsen* provide the clearest distinction. There, defendant was a Washington resident fishing with a Washington license within the boundaries of the state of Washington. The language relied upon by the

majority is dicta and does not appear to be the holding of any case. On the other hand, cases decided since *Nielsen*, albeit cases dealing with the federal-state relationship, are directly contrary to the *Nielsen* dicta.

As the majority states, the U. S. Supreme Court has not ruled on whether the dual sovereignty doctrine applies when two states have concurrent jurisdiction over a boundary river (Slip opinion at 6); however, the Supreme Court has held that states are sovereign. I conclude that if states are sovereign as to the federal-state relationship they are also sovereign as to the state-state relationship.

Justice Frankfurter, writing for the majority in *Bartkus v. Illinois*, 359 US 121, 79 S Ct 676, 3 L Ed 2d 684 (1959), said:

"* * * It would be in derogation of our federal system to displace the reserved power of States over state offenses by reason of prosecution of minor federal offenses by federal authorities beyond the control of the States.

"Some recent suggestions that the Constitution was in reality a deft device for establishing a centralized government are not only without factual justification but fly in the face of history. It has more accurately been shown that the men who wrote the Constitution as well as the citizens of the member States of the Confederation were fearful of the power of centralized government and sought to limit its power. Mr. Justice Brandeis has written that separation of powers was adopted in the Constitution 'not to promote efficiency but to preclude the exercise of arbitrary power.' Time has not lessened the concern of the Founders in devising a federal system which would likewise be a safeguard against arbitrary government. The greatest self-restraint is necessary when that federal system yields results with which a court is in little sympathy.

"The entire history of litigation and contention over the question of the imposition of a bar to a second prosecution by a government other than the one first prosecuting is a manifestation of the evolutionary unfolding of law. Today a number of

[573]

States have statutes which bar a second prosecution if the defendant has been once tried by another government for a similar offense. A study of the cases under the New York statute, which is typical of these laws, demonstrates that the task of determining when the federal and state statutes are so much alike that a prosecution under the former bars a prosecution under the latter is a difficult one. The proper solution of that problem frequently depends upon a judgment of the gravamen of the state statute. It depends also upon an understanding of the scope of the bar that has been historically granted in the State to prevent successive state prosecutions. Both these problems are ones with which the States are obviously more competent to deal than is this Court. Furthermore, the rules resulting will intimately affect the efforts of a State to develop a rational and just body of criminal law in the protection of its citizens. We ought not to utilize the Fourteenth Amendment to interfere with this development. * * *" (Footnotes omitted.) 359 US at 137-39.

It is this reasoning that prompted the statement in n 3 of the majority opinion (44 Or App 557, n 3) with reference to the Supreme Court's concern with the dynamics of the federal system. It is my contention that Article IV of the United States Constitution, which recognizes the autonomy of states, is as much a part of the dynamics of the federal system as the Tenth Amendment.

The Supreme Court in *Abbate v. United States*, 359 US 187, 79 S Ct 666, 3 L Ed 2d 729 (1959), which was decided the same day as *Bartkus* employs the following quote from *United States v. Lanza*, 260 US 377, 43 S Ct 141, 67 L Ed 314 (1922):

"We have here two sovereignties, deriving power from different sources, capable of dealing with the same subject matter within the same territory. * * * Each government in determining what shall be an offense against its peace and dignity is exercising its own sovereignty, not that of the other." 260 US at 382.

*United States v. Wheeler,* 435 US 313, 98 S Ct 1079, 55 L Ed 2d 303 (1978), summarizes the statements set out above by stating:

"Bartkus and Abbate rest on the basic structure of our federal system, in which States and the National Government are separate political communities. State and Federal Governments '[derive] power from different sources,' each from the organic law that established it. United States v. Lanza, 260 US 377, 382, 67 L Ed 314, 43 S Ct 141. Each has the power, inherent in any sovereign, independently to determine what shall be an offense against its authority and to punish such offenses, and in doing so each 'is exercising its own sovereignty, not that of the other.' Ibid. And while the States, as well as the Federal Government, are subject to the overriding requirements of the Federal Constitution, and the Supremacy Clause gives Congress within its sphere the power to enact laws superseding conflicting laws of the States, this degree of federal control over the exercise of state governmental power does not detract from the fact that it is a State's own sovereignty which is the origin of its power." (Footnote omitted.) 435 US at 321.

I conclude that Oregon has jurisdiction with Washington over the waters of the Columbia River as established by the Oregon Admissions Act and ORS 507.010.[1] I also conclude that where Oregon has jurisdiction it is not required to yield to another state in

---

[1] ORS 507.010—507.040 establishes the Oregon-Washington Columbia River fish compact.

ORS 507.010 provides in pertinent part:

"Congress, by virtue of the authority vested in it under section 10, Article I, United States Constitution, providing for compacts and agreements between states, having ratified the recommendations of the conference committees of the States of Oregon and Washington, appointed to agree on legislation necessary for the regulation, preservation and protection of fish in the waters of the Columbia River, over which said states have concurrent jurisdiction, and other waters within either state which would be affected by such concurrent interest, recommendations being as follows: 'We further recommend that a resolution be passed by the legislatures of Washington and Oregon, whereby the ratification by Congress of the laws of the States of

the prosecution of acts in violation of its laws because it is a separate sovereign. I agree with the state's argument that there is no reason to depart from the firmly established doctrine of concurrent jurisdiction as established in the cases cited above. To do otherwise would allow one state, once obtaining personal jurisdiction over the defendant, to freely prosecute, but at the same time would deny the other state the right to prosecute. It would also encourage defendants to land their boats and their illicite catch on the side of the Columbia River having the least serious penalties or the most lenient enforcement. This would reduce the effectiveness of law enforcement on both sides of the Columbia and further weaken the control over the Columbia River fishery which is vital to both the state of Washington and the state of Oregon.

Oregon and Washington shall act as a treaty between said states, subject to modification only by joint agreement by said states;' * * *."

The Compact in ORS 507.040 provides in pertinent part:

"* * * * *

### "ARTICLE VIII

"Nothing in this compact shall be construed to limit the powers of any state or to repeal or prevent the enactment of any legislation or the enforcement of any requirement by any state imposing additional conditions and restrictions to conserve its fisheries.