Argued and submitted March 27, reversed and remanded for new trial
December 26, 1990

# STATE OF OREGON
## and City of Portland,
*Respondents,*

*v.*

## EUGENE H. PEPPER,
*Appellant.*

(DA 368849, M959220, M959221, M959222;
CA A60761 (Control); A60762; A60763; A60764)
(Cases Consolidated)

803 P2d 1213

Glenn N. Solomon, Salem, argued the cause for appellant. With him on the brief was Sally L. Avera, Acting Public Defender, Salem.

Robert M. Atkinson, Assistant Attorney General, Salem, argued the cause for respondents. With him on the brief were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Before Joseph, Chief Judge,* and Riggs and Edmonds, Judges.

PER CURIAM

Riggs, J., specially concurring.

---

* Joseph, C. J., *vice* Graber, *former P. J.*

## PER CURIAM

Defendant appeals his convictions for various misdemeanors and traffic offenses. He claims that the trial court erred when it denied his pretrial motion to suppress evidence. The offenses took place in Oregon. He argues that the evidence, seized incident to his arrest, was the fruit of an unlawful search, because the Portland city policemen who performed the search had no authority to pursue him from Oregon into Washington and to arrest him there.

The only issue that defendant presents is the authority of the policemen to make a lawful arrest in Washington for non-felony offenses committed in Oregon. The state points to no authority for the arrest. No issue of concurrent jurisdiction is presented on these facts. *See State v. Nearing,* 99 Or App 724, 784 P2d 121 (1989), *rev den* 309 Or 698 (1990).

Reversed and remanded for a new trial.

**RIGGS, J.,** specially concurring.

The state, the defendant and the trial court judge will no doubt be as bewildered as I was after they read the following passage from the majority opinion:

"The state points to no authority for the arrest. No issue of concurrent jurisdiction is presented on these facts. *See State v. Nearing,* 99 Or App 724, 784 P2d 121 (1989), *rev den* 309 Or 698 (1990)." 105 Or App at 108.

The record shows otherwise. By ignoring the record and misstating the issue, the majority avoids reexamination of *State v. Nearing, supra.* In *Nearing,* we held that Oregon has concurrent jurisdiction with Washington on bridges that span the Columbia River. At every opportunity, the state has pointed to concurrent jurisdiction as authority for defendant's arrest. *Nearing* controls; it requires that we affirm. However, I am concurring in the reversal of defendant's convictions, because I believe that *Nearing* was wrongly decided and should be overruled.

The facts in this case are taken, in large part, from the hearing on the motion to suppress. A Portland police officer observed defendant driving northbound on Interstate 205 from Oregon to Washington across the Glenn Jackson Bridge over the Columbia River. The border between the two

states is located along a fixed line in the middle of the river. The officer was involved in an unrelated traffic stop on the bridge on the Oregon side when he first noticed that defendant was driving erratically. He and another officer chased defendant across the border and ultimately stopped, arrested and searched him near the highway exit for Camas, Washington, at a point on the bridge structure over land that is within the State of Washington.

The state charged defendant with careless driving, possession of a controlled substance, carrying a loaded firearm, failure to have a driver's license and driving under the influence of intoxicants. Defendant moved to suppress the evidence. He argued, *inter alia,* that Oregon police lacked authority to arrest him in Washington for offenses committed in Oregon that are not felonies, but only misdemeanors. He argued that under the Uniform Fresh Pursuit Act, which both Oregon and Washington have enacted, Oregon law enforcement officers who are in fresh pursuit into Washington of a person who has committed, or is suspected of having committed, a *felony* in Oregon, may pursue and arrest that person in Washington. RCW 10.89.010. Nothing in the record suggests that defendant committed, or that the officer suspected that defendant had committed, a felony in Oregon.

The state did not rely on the Uniform Fresh Pursuit Act. Instead, it placed exclusive reliance on the fact that the defendant was still on the bridge structure, although on the Washington side of the line, when he was arrested. The prosecutor stated:

> "Our contention that the defendant was stopped on the bridge clearly shows that the officers * * * still had jurisdiction over the defendant when they stopped him. He was stopped. He was arrested. He was cited in lieu of being taken in and his vehicle was searched incident to a lawful arrest. He was turned over to the Washington State Patrolman at that point and the defendant's vehicle was towed back on order of the Portland Police Department. Our contention is that they were still within their jurisdiction to arrest the defendant for being under the influence and the search of his vehicle was legal."

The source of authority for the officers' power to arrest an individual on the bridge was clearly articulated by the prosecutor:

"[B]ecause of the concurrent jurisdiction given to the State of Oregon in the enabling statute [over] any crime that's committed either on the waters of a river which forms the common boundary between two states or a bridge which spans a common boundary, that both Oregon and Washington would have jurisdiction if they begin a pursuit of an individual who had committed a crime in their state and stopped an individual while still on the bridge. The state's not arguing that the officers would still have jurisdiction if the defendant had gotten across [the bridge].

"* * * * *

"The state is contending that the officers would have had a right to bring Mr. Pepper back under arrest, but instead they cited him and released him to the Washington State Patrolman. The search of his vehicle was incident to a legal arrest. I think the whole argument here is based on the jurisdictional [question]. Did the State of Oregon have jurisdiction on the Glenn Jackson Bridge?"

The basis for the court's denial of the motion to suppress was equally clear:

"Court: This was a border situation as far as this court is concerned. It was committed at or near the border on the Oregon side and on the bridge itself. And on the Oregon side as well as on the Washington side.

"* * * * *

"Defense Counsel: Are you saying then that the Fresh Pursuit Act is not applicable here?

"Court: That's right. Under the Fresh Pursuit Act, you'd have to have a felony situation. I think the statute's pretty clear on that.

"Defense Counsel: And so you're saying that in spite of that that the officer still had authority because of your finding that there was concurrent jurisdiction?

"Court: Right."

On appeal, defendant assigns error to the court's denial of his pretrial motion to suppress. He argues here, as he did below, that Oregon police lacked authority to cross the border on the bridge and arrest him for offenses that are not felonies, but only misdemeanors. The state also raises the same argument that it raised below. In support of its position, the state cites *State v. Nearing, supra,* in which we held that

Oregon has concurrent jurisdiction with Washington on bridges that cross the boundary river between the two states.[1]

Defendant's assignment of error requires this court once again to apply the legal concept of concurrent jurisdiction in a factual setting that raises "curious and difficult questions." *Nielsen v. Oregon*, 212 US 315, 321, 29 S Ct 383, 53 L Ed 528 (1909). The analysis will benefit from a chronological review of the relevant legislative enactments and judicial decisions involving concurrent jurisdiction over the Columbia River.

In 1853, Congress carved the Territory of Washington out of the much larger Territory of Oregon.[2] Congress defined much of Washington's southern boundary as "the main channel of the Columbia River" and provided that the two territories "shall have concurrent jurisdiction over all offenses committed on the Columbia River, where said river forms a common boundary between said Territories." Act of March 2, 1853, ch 90, § 21, 10 Stat 172. In preparation for statehood, the Oregon Constitutional Convention of 1857 drafted a constitution that added civil jurisdiction to the already existing concurrent jurisdiction over criminal matters. Wollenberg, "The Columbia River Fish Compact," 18 Or Law Rev 88, 92 (1939) (hereafter Wollenberg).

Oregon was admitted to the Union in 1859. The Oregon Admission Act "ordained and declared" the western part of the northern boundary of Oregon to be

> "a point due west and opposite the middle of the north ship channel of the Columbia River; thence easterly, to and up the middle [of the main] channel of said river, and where it is divided by islands, up the middle of the widest channel thereof." Act of February 14, 1859, ch 33, § 1, 11 Stat 383.[3]

---

[1] We decided *Nearing* after defendant here had filed his brief on appeal, but before the state had filed its brief.

[2] The Territory of Oregon was established in 1848. Act of August 14, 1848, ch 177, 9 Stat 323.

[3] In *Washington v. Oregon*, 214 US 205, 216, 29 S Ct 631, 53 L Ed 969 (1909), the Supreme Court resolved a property dispute between the two states and held that the language "middle channel" should properly be construed as "the middle of the main channel." The Court urged Washington and Oregon to adopt an interstate compact that would "adjust, as far as possible, the present appropriate boundaries between the two States and their respective jurisdiction." 214 US at 218. That adjustment took place in 1958. *See* n 8, *infra,* and accompanying text.

After further defining the Oregon border, the same section provided Oregon with

"jurisdiction in civil and criminal cases upon the Columbia River and Snake River, concurrently with States and Territories of which those rivers form a boundary in common with this State." Act of February 14, 1859, ch 33, § 1, 11 Stat 383.

Section 2 provided, in relevant part:

"Oregon shall have concurrent jurisdiction on the Columbia and all other rivers and waters bordering on the said State of Oregon so far as the same shall form a common boundary to said State, and any other State or States now or hereafter to be formed or bounded by the same." Act of February 14, 1859, ch 33, § 2, 11 Stat 383.

With that statute, Congress reaffirmed the already existing concurrent jurisdiction over criminal matters that it had granted the *Territory* of Oregon in 1853 and extended to the *State* of Oregon concurrent jurisdiction over civil matters. *In re Mattson*, 69 F 535, 538 (CC D Or 1895).

Only a handful of cases have applied the concept of concurrent jurisdiction to the Columbia River. They fall into two categories. Some have involved attempts by the states to regulate fishing. Others have involved questions about the relationship between the grant to Oregon of concurrent jurisdiction and the jurisdiction of Oregon's federal district court.

The first case fell into the latter category and arose 13 years after statehood. In *The Annie M. Smull*, 1 Fed Cas 983 (D Or 1872) (No 423), a group of sailors, as part of a lawsuit to recover wages, caused a ship to be served with civil process while it was lying to the north of the Columbia River channel off Kalama, in what was then the Territory of Washington. The issue was whether the jurisdiction of the United States District Court for the District of Oregon extended north of the channel. Judge Deady began his analysis with an acknowledgement that "the boundary of the state and district are identical" and that that boundary was the Columbia River channel. 1 Fed Cas at 984. However, he went on to observe:

"[The clause granting Oregon concurrent jurisdiction in the Oregon Admission Act] is a legislative declaration or enactment that the jurisdiction of the state—that is, its whole sovereign power shall extend to the whole river, subject to the qualification that the jurisdiction of the state or territory on

its northern shore, shall in like manner extend to its southern shore. *In effect, this makes the northern shore of the river the northern boundary of the state, for its territorial limits and jurisdiction are necessarily the same. Practically, then, so far as the Columbia river forms a boundary common to Oregon and Washington, it is within the territorial limits and jurisdiction of each.* In the language of the [Oregon Admission Act], it is the common property and 'highway' of both. This being so, the river is also within the jurisdiction of the district of Oregon, and therefore this court has jurisdiction of this suit." 1 Fed Cas at 984. (Emphasis supplied.)[4]

In 1881, the Oregon Supreme Court decided that an Oregon law that prohibited Sunday fishing for salmon "in any stream of water, bay or inlet of the sea, or river of this state" did not include the Columbia River. *State v. Sturgess,* 10 Or 58, 61 (1881). That construction obviated the need for any analysis of concurrent jurisdiction. However, in *dictum,* the court cited *The Annie M. Smull* and stated that the Columbia River was "not only a common boundary between the State of Oregon and Washington Territory, but *the common territory of both, and equally subject to the jurisdiction and laws of both.*" 10 Or at 61. (Emphasis supplied.) The two cases, one state and one federal, adopted what was essentially a "common territory" theory as to the river. In effect, Oregon and Washington had overlapping boundaries on the river. Oregon was free to enact laws and prosecute violations for offenses that took place anywhere on the river. According to one commentator:

"The theory was questioned only after the development of commercial salmon fishing on the river and the application by Oregon officials of Oregon fish laws over the whole river. Washington fish statutes were, on the whole, less stringent." Wollenberg at 92.

Judge Deady's "common territory" approach was squarely rejected in the 1895 federal court case *In re Mattson, supra.* By that time, the Oregon statute under discussion in *State v. Sturgess, supra,* had been amended in such a way as to

---

[4] Judge Deady cautioned that his opinion was intended to apply to jurisdiction over "matters and things actually arising or situate upon the river. The concurrent jurisdiction is not understood to extend over any islands or dry land within the river. As to such, and probably only such, the middle thread of the river is the absolute boundary line of both state and district." *The Annie M. Smull, supra,* 1 Fed Cas at 984.

include the Columbia River in the Sunday fishing ban. Washington law, however, did *not* prohibit Sunday fishing. Oregon officials arrested Mattson on the river at a point north of the channel for violating Oregon's ban. After his conviction and imprisonment, he applied for—and received—habeas corpus relief.

After a review of numerous cases on concurrent jurisdiction, the court drew a distinction between offenses that are *malum prohibitum* and *malum in se*,[5] stating that Oregon, under its grant of concurrent jurisdiction, had authority to arrest and prosecute *malum prohibitum* conduct north of the channel, only if Washington also prohibited the conduct. *In re Mattson, supra,* 69 F at 542. That holding was later extended to deny Oregon the authority to enforce an asymmetrical *malum prohibitum* Oregon law even against nonresidents when the offense arguably took place on the *Oregon side* of the channel. *Ex parte Desjeiro,* 152 F 1004 (CC D Or 1907).[6] As a result of those two federal cases,

> "[s]tate regulation of fishing on the river broke down. * * * The fishing industry on the river declined, reaching a new low level in 1908, when another attempt was made in the courts of Clatsop County to enforce Oregon fish laws over the whole river against all comers." Wollenberg at 93.

The Oregon Supreme Court, in *State v. Nielsen,* 51 Or 588, 95 P 720 (1908), attempted to regain what it considered lost jurisdiction over the river and repudiated *In re Mattson* and *Ex parte Desjeiro.* The United States Supreme Court reversed. *Nielsen v. Oregon, supra.* As in *In re Mattson,* the issue was whether concurrent jurisdiction gave Oregon the authority to convict a Washington resident, who had been fishing on the Washington side of the river, of the Oregon

---

[5] "An offense *malum in se* is properly defined as one which is naturally evil, as adjudged by the sense of a civilized community. An act which is *malum prohibitum* is wrong only because made so by statute." *State v. Trent,* 122 Or 444, 476, 259 P 893 (1927).

[6] "It is the act of concurrence between the two states, in the exercise of legislative authority, that validates the act and gives it the force of law, and, unless there is a concurrence or assent by both states to the enactment, it cannot have that force. This is the doctrine of the Mattson Case, and it has direct application to the case at bar." *Ex parte Desjeiro, supra,* 152 F at 1007.

offense of fishing with a purse seine. Not only did Washington law not prohibit that conduct, it expressly authorized it.

The Court, looking to the grant of concurrent jurisdiction in the Oregon Admission Act, observed: "How that jurisdiction is to be exercised, what limitations there are, if any, upon the power of either state, is not in terms prescribed." *Nielsen v. Oregon, supra,* 212 US at 319. *Nielsen* cited *Wedding v. Meyler,* 192 US 573, 24 S Ct 322, 48 L Ed 570 (1904), in which the Court explained the grant of concurrent jurisdiction given to Kentucky and Indiana over the Ohio River by the Virginia Compact. In *Wedding,* the Court held that service of process in a civil action on a steamboat in the Ohio River, over which the two states had concurrent jurisdiction, was effective. The Court said that concurrent jurisdiction "was familiar to our legislation"; it meant "the jurisdiction of two powers over one and the same place" and "the authority to apply the law to the acts of men." *Wedding v. Meyler, supra,* 192 US at 584.

With this general definition in mind, *Nielsen* discussed the purposes of concurrent jurisdiction:

"Undoubtedly one purpose, perhaps the primary purpose, in the grant of concurrent jurisdiction, was to avoid any nice question as to whether a criminal act sought to be prosecuted was committed on one side or the other of the exact boundary in the channel, that boundary sometimes changing by reason of the shifting of the channel." 212 US at 320.

*Nielsen,* however, acknowledged that the concurrent jurisdiction afforded Oregon was not limited to criminal matters, but "extends to civil as well as criminal matters." 212 US at 320. Confining itself to the precise issue raised and noting the potential for conflict between the states that have divergent interests in criminal law enforcement, *Nielsen* adopted the distinction in *In re Mattson* between offenses that are *malum prohibitum* and *malum in se.* The Court held that Oregon could not override the will of the legislature in Washington and punish a person for doing in Washington something that he was authorized to do by the law of that state. It refused to discuss the more drastic holding in *Ex parte Desjeiro, supra.*[7]

---

[7] Subsequent cases confined *Ex parte Desjeiro, supra,* to its facts. *See, e.g., State v. Catholic,* 75 Or 367, 384, 147 P 372 (1915).

The controversy over Columbia River fishing regulation eased somewhat, but did not disappear, after Oregon and Washington entered into a compact in 1915 to preserve and protect fish. Congress ratified the compact in 1918. Act of April 8, 1918, ch 47, 40 Stat 515; ORS 507.010; *see Olin v. Kitzmiller,* 259 US 260, 42 S Ct 510, 66 L Ed 930 (1922); *Alsos v. Kendenall,* 111 Or 359, 227 P 286 (1924); 17 Op Att'y Gen 373 (1935); *see generally* Wollenberg.

In 1958, the description of the Oregon-Washington boundary as the "middle of the main channel" of the river passed into history. Congress approved the Oregon and Washington Columbia River Compact (the 1958 Compact), which redefined the border by a legal description. Act of July 31, 1958, Pub L No 85-575, 72 Stat 455. The reason for the change was stated in the 1958 Compact:

> "The boundary between the States of Oregon and Washington along the course of the Columbia River has not been easy to ascertain because of changes in the main channel of the river with a result that a state of confusion and dispute exists and the enforcement and administration of the laws of the two states has been rendered difficult." ORS 186.520; RCW 43.58.050.[8]

The first case to discuss concurrent jurisdiction after the 1958 Compact took effect came in 1967, when a longshoreman was injured aboard a vessel afloat in the Columbia River on the Washington side at Longview. The employer sued in federal district court in Oregon to enjoin the government from enforcing a compensation award. *W.J. Jones & Son, Inc. v. Stocker,* 271 F Supp 437 (D Or 1967). The court rejected the government's argument that the 1958 Compact had somehow affected the territory over which the federal district court could exercise jurisdiction:

> "The District of Oregon is a jurisdictional entity, not a geographical one. The jurisdiction of the Oregon state courts includes concurrent jurisdiction with Washington of [*sic*] the waters in question. Oregon is one judicial district. 28 U.S.C.

---

[8] At least one post-1958 Compact case has stated that the boundary between Oregon and Washington "is the midchannel of the Columbia River." *United States v. Crookshanks,* 441 F Supp 268, 269 (D Or 1977). That is incorrect. The error was repeated in an opinion of the Attorney General. 40 Op Att'y Gen 422 n 1 (1980).

§ 117. The territorial jurisdiction of the District of Oregon and of the State of Oregon are identical." 271 F Supp at 438.[9]

The first discussion of concurrent jurisdiction on the Columbia River by this court appears in *State v. Alexander,* 44 Or App 557, 607 P2d 181, *aff'd mem* 289 Or 743, 617 P2d 1376 (1980). Oregon had prosecuted the defendants for the same fishing activities on the Columbia River for which Washington had earlier convicted them. The issue was whether the "dual sovereignty rule"[10] allowed Oregon to proceed with its prosecution. The majority in *Alexander,* relying on *dictum* in *Nielsen v. Oregon, supra,* concluded that the grant of concurrent jurisdiction in the Oregon Admission Act precluded Oregon from prosecuting a person for unlawful conduct that took place on the Columbia River if Washington had previously prosecuted for the same conduct.[11]

This limited case law involving concurrent jurisdiction on the Columbia River finally spawned our recent decision in *State v. Nearing, supra.* In *Nearing,* a Washington State police officer stopped the defendant on the Glenn Jackson Bridge for suspected drunk driving. The officer called the Oregon State Police, which sent an officer to the scene. That officer issued the citation on which the defendant was tried. There was no evidence in the Oregon court trial as to where the defendant was when the Washington officer first saw him or where he was when he was stopped. The defendant moved for a judgment of acquittal, because the state had failed to prove venue. The trial court concluded that the state had established venue, because Oregon and Washington have concurrent jurisdiction over offenses committed on permanent bridges spanning the Columbia River.

In a case of first impression, we affirmed. We said:

"It is our task to determine if the intent of the Admission Act was to grant concurrent jurisdiction on bridges over the river.

---

[9] The federal district court's jurisdiction over the part of the Columbia River that borders Washington was reaffirmed in *United States v. Crookshanks, supra,* 441 F Supp at 269; *Puget Sound Gillnetters Assn v. US Dist Court,* 573 F2d 1123, 1133 (9th Cir 1978), and *United States v. State of Oregon,* 657 F2d 1009, 1016 (9th Cir 1981).

[10] *See Heath v. Alabama,* 474 US 82, 106 S Ct 433, 88 L Ed 2d 387 (1985).

[11] The trial court in the present case explicitly relied on *Alexander* to conclude that Oregon had concurrent jurisdiction over the Glenn Jackson Bridge. We had not yet decided *Nearing.*

> There appears to be no persuasive reason why, at the time of the Admission Act, Congress would have granted concurrent jurisdiction over offenses occurring on the water, but not for offenses occurring on bridges above the water. Accordingly, we hold that the Oregon Admission Act created concurrent jurisdiction on bridges that cross the Columbia River between Oregon and Washington." *State v. Nearing, supra,* 99 Or App at 727-28.

We focused primarily on what Congress intended by the preposition "upon" in the phrase "upon the Columbia River" in section 1 of the Oregon Admission Act. Our reliance on that preposition cannot sustain the conclusion we reached regarding legislative intent. Nothing in the text or structure of the Oregon Admission Act suggests that Congress ever considered the specific issue of whether Oregon should have concurrent jurisdiction on interstate bridges.

When, as here, the words of a statute are not sufficiently explicit to manifest the intent of the legislature, we consider "the context, the subject matter, the necessity for the law, and the circumstances under which it was enacted, the mischief sought to be remedied, and the object to be attained." *Union Fisherman's Co. v. Shoemaker,* 98 Or 659, 671, 193 P 476 (1920). When, however, despite that consideration, the intent cannot be ascertained, courts should "give the statute a reasonable construction consistent with the general principles of law." 98 Or App at 671.

In *Nearing,* we relied principally on a line of "bridge cases" from other state courts, all of which had relied on the late-nineteenth century case of *State v. George,* 60 Minn 503, 63 NW 100 (1895). In *George,* the court held that the grant to Minnesota of concurrent jurisdiction gave it authority to prosecute larceny[12] that took place anywhere on a bridge over the Mississippi River. In language similar to that that would come 16 years later in *Nielsen v. Oregon,* the court stated:

> "One of the reasons for establishing this concurrent jurisdiction was to prevent the escape of criminals on account of the uncertainty that so frequently arises as to whether the act was committed on one side of the middle of the main channel or the other side of it. *This uncertainty exists just as well*

---

[12] It is also worth noting, in passing, that larceny is considered a *malum in se* offense.

*when the act is committed on a bridge as when committed on a water craft."* 60 Minn at 506. (Emphasis supplied.)

It is significant that, in the bridge cases on which *Nearing* relied, the boundaries between the relevant states, at the time of those decisions, were defined by reference to the channels of the rivers that passed under the bridges at issue.[13] The uncertainty discussed in *George* and its progeny exists, not because the offenses take place on bridges, *but because of the nature of the boundary under those bridges.*

It is impossible to mark a boundary on a bridge with a precise line when the boundary is defined as a river channel, because, over time and through the forces of nature, that line, or "thalweg," moves toward one shore and away from the other, *see, e.g., Washington v. Oregon,* 211 US 127, 134-36, 29 S Ct 47, 53 L Ed 118 (1908), and, consequently, laterally along the bridge. Thus, although the bridge is a fixed object, the boundary over which it passes is not. Any boundary marking on the bridge would become wrong over time.

In *Nearing,* we said:

"Defendant argues that, although concurrent jurisdiction may be necessary when it is difficult to ascertain a precise boundary, it is unnecessary here, because the Oregon-Washington boundary is precise and could be easily marked on the bridge. It is true that, in 1958, the Oregon-Washington Columbia River Compact fixed the Oregon and Washington boundary. ORS 186.510. That compact, however, did not alter the grant of concurrent jurisdiction in the Admission Act. *W.J. Jones & Son, Inc. v. Stocker,* 271 F Supp 437, 438-39 (D Or 1967)."

We erred in relying on *Stocker* to resolve that issue. The issue there was whether the 1958 Compact fixed the boundary with such precision that it could no longer be argued that any point north of the new line was within the federal court's district.

"The compact did not change the territorial jurisdiction of this Court, its expressed purpose was to eliminate confusion and dispute about the exact location of the boundaries

---

[13] *People v. Pitt,* 106 Ill App 3d 117, 435 NE2d 801 (1982) (Missouri-Illinois border; Mississippi River; Act of March 6, 1820, ch 22, 3 Stat 545); *State v. LeGear,* 346 NW2d 21 (Iowa 1984)(Iowa-Nebraska border; Missouri River; Act of July 12, 1943, ch 220, 57 Stat 494; *Nebraska v. Iowa,* 406 US 117, 119, 92 S Ct 1379, 31 L Ed 2d 733 (1972)).

because of changes in the main channel of the river." *W.J. Jones & Son, Inc. v. Stocker, supra,* 271 F Supp at 438.

The most that can be said of *Stocker* is that it reaffirmed Congress' grant of concurrent jurisdiction on the water. It did not involve a bridge. Moreover, it neither resolved nor addressed the issue of what effect the 1958 Compact had on concurrent jurisdiction with respect to border bridges.

Assuming, *arguendo,* that Oregon had concurrent jurisdiction over border bridges before the 1958 Compact, we must decide whether that concurrent jurisdiction survived the adoption of the 1958 Compact. As did the United States Supreme Court in *Nielsen v. Oregon, supra,* we should keep the purposes of concurrent jurisdiction firmly in mind as we apply it.

As stated above, the difficulty in determining where the larceny took place in *George* existed, not because the thief was on a bridge that spanned the boundary water, but because the boundary under that bridge was inherently imprecise. That is no longer the case in Oregon. The need for concurrent jurisdiction on bridges, which was made necessary because of imperceptible and imprecise borders in boundary waters, has ceased to exist on bridges over the Columbia River between Oregon and Washington.

One commentator has described the ability of one state, through concurrent jurisdiction, to exercise power in the territory of its neighboring state as "incongruous," but yet "wise and almost necessary" and "perhaps unavoidable." Rorer, *American Interstate Law* 338, 340 (2d ed 1893). Under our system of federalism, which includes states that are sovereign *vis-à-vis* each other, the concept of concurrent jurisdiction is best applied in such a way that those incongruities and conflicts are minimized.

*Nearing's* holding, that concurrent jurisdiction exists anywhere on the bridge, extends those unavoidable incongruities far beyond what is necessary to achieve the wise and necessary goals gained from the existence of concurrent jurisdiction. *Nearing's* reasoning needlessly forces Oregon courts to define what is meant by "bridge" and to decide the "curious and difficult" questions presented in defendant's appeal: How far into the State of Washington does Oregon's

grant of concurrent jurisdiction extend on this interstate highway bridge? Does it extend to the water's edge, to the first highway exit, to the point where the bridge is no longer supported by raised columns—or to some point beyond? In *Nearing,* we attempted to reach a practical result. However, our holding reintroduced confusion and uncertainty in the enforcement and administration of law that the two states sought to eliminate when they settled the location of their border in 1958. ORS 186.520.

The reasons for concurrent jurisdiction are not present for these offenses, which were committed on a modern interstate highway bridge. Defendant's misdemeanor traffic, drug and firearm offenses were in no way related to marine navigation or commercial, recreational or scientific use of the Columbia River. Because the border is fixed and the bridge is a permanent object, determination of venue, at issue in *Nearing,* is no more difficult than when a crime takes place at or near the land border between two states.[14] The same can be said about determination of the location, and consequently, the legality of an arrest, the issue in the case currently before us.

Concurrent jurisdiction, regardless of whether it is characterized as extending the territory of a state to overlap that of its neighbor or as extending the sovereign power of a state to act outside its territory, provides the theoretical foundation for the state's authority to act in both the venue and arrest contexts. *Nearing* controls the outcome of this case.

The trial court in this case denied the suppression motion because it concluded that Oregon has concurrent jurisdiction with Washington on the bridge. I would overrule *State v. Nearing, supra,* and hold that Oregon does *not* have concurrent jurisdiction with Washington on permanent interstate bridges between Oregon and Washington for the types of offenses at issue here. I would, therefore, conclude that the arrest was unlawful.

The state concedes in its brief that a determination that the arrest was unlawful would have required suppression of the items seized from defendant's truck.

---

[14] *See State v. Vickers,* 18 Wash App 111, 567 P2d 675 (1977), in which the issue was whether the prosecutor's evidence was sufficient to show that a crime had taken place on the Washington side of an interstate highway bridge over the Columbia River.

I would also reverse defendant's convictions and remand the matter for a new trial.