# NEBRASKA *v.* IOWA

No. 17, Orig.  Argued March 29, 1972—Decided April 24, 1972

BRENNAN, J., delivered the opinion for a unanimous Court.

*Howard H. Moldenhauer,* Special Assistant Attorney General of Nebraska, argued the cause for plaintiff. With him on the briefs were *Clarence A. H. Meyer,* Attorney General, and *Joseph R. Moore,* Special Assistant Attorney General.

*Michael Murray,* Special Assistant Attorney General of Iowa, argued the cause for defendant.  With him on the briefs were *Richard C. Turner,* Attorney General, and *Manning Walker,* Special Assistant Attorney General.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

Both Iowa and Nebraska filed Exceptions to the Report submitted by the Special Master in this original action brought by Nebraska against Iowa for construction

and enforcement of the Iowa-Nebraska Boundary Compact of 1943.[1]

The Missouri River is the boundary between the two States. In 1892, in another suit brought by Nebraska against Iowa, this Court held that the boundary line in the river at Carter Lake, Iowa, was to be located according to the principle that the boundary "is a varying line" so far as affected by "changes of diminution and accretion in the mere washing of the waters of the stream," but not where the river is shifted by avulsion: "By this selection of a new channel the boundary was not changed, and it remained as it was prior to the avulsion, the centre line of the old channel; . . . unless the waters of the river returned to their former bed, [such center line] became a fixed and unvarying boundary, no matter what might be the changes of the river in its new channel." *Nebraska* v. *Iowa,* 143 U. S. 359, 370 (1892); the decree is in 145 U. S. 519 (1892). The Compact adopts this line at Carter Lake, and for the rest of the boundary fixes the line in "the middle of the main channel of the Missouri river," defined as the "center line of the proposed stabilized channel of the Missouri river as estab-

---

[1] Iowa Code 1971, p. lxiv; Iowa Acts 1943, c. 306; Nebraska Laws 1943, c. 130; Act of July 12, 1943, 57 Stat. 494.

Leave to file the action was granted in 1965. 379 U. S. 876 (1964); 379 U. S. 996 (1965). There have been successive Special Masters. See 380 U. S. 968 (1965); 392 U. S. 918 (1968); 393 U. S. 910 (1968). Senior Judge Joseph P. Willson completed the case after extensive hearings and filed his Report on November 9, 1971. 404 U. S. 933 (1971). The Exceptions of the States were orally argued before this Court on March 29, 1972.

Iowa's Exception I renews the objection to the Court's jurisdiction that was overruled when leave to file was granted. We overrule the Exception. "Just as this Court has power to settle disputes between States where there is no compact, it must have final power to pass upon the meaning and validity of compacts." *West Virginia ex rel. Dyer* v. *Sims,* 341 U. S. 22, 28 (1951); Const. Art. III, § 2; 28 U. S. C. § 1251.

lished by the United States engineers' office, Omaha, Nebraska, and shown on the alluvial plain maps of the Missouri river from Sioux City, Iowa, to Rulo, Nebraska, and identified by file numbers AP–1 to 4 inclusive, dated January 30, 1940, and file numbers AP–5 to 10 inclusive, dated March 29, 1940, which maps are now on file in the United States engineers' office at Omaha, Nebraska, and copies of which maps are now on file with the secretary of state of the State of Iowa and with the secretary of state of the State of Nebraska." The "proposed stabilized channel" refers to a project begun in the early 1930's by the United States Army Corps of Engineers to tame the river along its entire length by containing it within a designed channel. The work had been partially completed by 1943, but was suspended when World War II intervened. When work resumed in 1948, the channel was partly redesigned, and by 1959 the river had been confined in the newly designed channel.

The States determined in 1943 to agree by compact upon a permanent location of the boundary line when experience showed that "the fickle Missouri River . . . refused to be bound by the Supreme Court decree [of 1892]. In the past thirty-five years the river has changed its course so often that it has proved impossible to apply the court decision in all cases, since it is difficult to determine whether the channel of the river has changed by 'the law of accretion' or 'that of avulsion.' " Eriksson, Boundaries of Iowa, 25 Iowa J. of Hist. and Pol. 163, 234 (1927). The Special Master found, on ample evidence, and we adopt his findings, that by 1943 the shifts of the river channel had been so numerous and intricate, both in its natural state and as a result of the work of the Corps of Engineers, that it would be practically impossible to locate the original boundary line.[2]

---

[2] Report 63, 65, 67, 68, 80.

The fixing of the permanent boundary by Compact resulted in some riparian lands formerly in each State being located within the other State. This created the problem of the effect to be given by the new State to titles, mortgages, and other liens that had arisen under the laws of the other State. Sections 2 and 3 of the Compact were designed to solve this problem.[3] Under § 2 each State "cedes" to the other State "and relinquishes jurisdiction over" all such lands now located within the Compact boundary of the other. Under § 3, "[t]itles, mortgages, and other liens" affecting such lands "good in" the ceding State "shall be good in" the other State.

The instant dispute between the States arose when Iowa in 1963 claimed state ownership of some 30 separate areas of land, water, marsh, or mixture of the three wholly on the Iowa side of the Compact boundary. The eighth and part of a ninth such areas were formed before 1943. The 21st and part of a 22d were formed after 1943.[4] Iowa's claim was based on Iowa common

---

[3] Each State Legislature adopted a statute to evidence its agreement to the Compact. Sections 2 and 3 of each statute create obligations reciprocated by the other State in §§ 2 and 3 of its statute. In the Iowa statute the sections are:

"SEC. 2. The State of Iowa hereby cedes to the State of Nebraska and relinquishes jurisdiction over all lands now in Iowa but lying westerly of said boundary line and contiguous to lands in Nebraska.

"SEC. 3. Titles, mortgages, and other liens good in Nebraska shall be good in Iowa as to any lands Nebraska may cede to Iowa and any pending suits or actions concerning said lands may be prosecuted to final judgment in Nebraska and such judgments shall be accorded full force and effect in Iowa."

[4] The areas formed before 1943 are Nottleman Island, Schemmel Island, St. Mary's Bend, Auldon Bar, Copeland Bend, State Line Island, Wilson Island, Deer Island, and a portion of Winnebago Bend. Report 106, 165.

The areas formed since 1943 are Dakota Bend, Omadi Bend, Between Omadi and Browers Bends, Snyder Bend, Glover's Point Bend, Rabbit Island, Upper Monona Bend, Monona Bend, Blackbird Bend,

law that private titles to riparian lands run only to the ordinary high-water mark on navigable streams and that the State is the owner of the beds of all navigable streams within the State and is also the owner of any islands that may form therein. *Mc-Manus* v. *Carmichael*, 3 Iowa 1 (1856); *Holman* v. *Hodges*, 112 Iowa 714, 84 N. W. 950 (1901). The areas formed before 1943 lie south of Omaha and those formed after 1943 lie north of Omaha. Two of the pre-1943 areas are Nottleman Island and Schemmel Island. Each is the subject of an action to quiet title brought by Iowa in Iowa courts.[5] The defense in each case is that there exist "titles . . . good in Nebraska" to the islands that, under § 3 of the Compact, Iowa obligated itself to recognize to be "good in Iowa" as against any claim of Iowa under its doctrine of state ownership.

Thus, the controversy between the States in this case centers around the proper construction of their Compact. The Special Master's Findings and Conclusions generally favor Nebraska's position on the merits of the controversy over the areas that formed before July 12, 1943, and Iowa's exceptions are addressed to them. On the other hand, the Findings and Conclusions favor Iowa's position on the merits of the controversy over the areas that formed after July 12, 1943, and Nebraska's exceptions are primarily addressed to them. We overrule all excep-

---

Tieville Bend, Upper Decatur Bend, Middle Decatur Bend, Lower Decatur Bend, Louisville Bend, Blencoe Bend, Little Sioux Bend, Bullard Bend, Soldier Bend, Sandy Point Bend, Tyson Bend, and California Bend. *Id.*, at 107.

[5] On March 18, 1963, Iowa filed, in the District Court for Mills County, *State of Iowa* v. *Darwin Merrit Babbit et al.*, Equity No. 17433 to quiet title to Nottleman Island. On March 26, 1963, Iowa filed, in the District Court of Fremont County, *State of Iowa* v. *Henry E. Schemmel et al.*, Equity No. 19765 to quiet title to Schemmel Island. Proceedings in the actions have been suspended pending our decision.

tions, save two, of Nebraska's addressed to printing errors in the Report,[6] except as we sustain, *infra,* Iowa's Exceptions IV and V insofar as the Special Master recommended that an injunction issue, and except as mentioned in n. 8, *infra.*

The Special Master construed the word "cedes" in § 2 as meant by the States to describe all areas formed before July 12, 1943, regardless of their location with reference to the original boundary, whose "[t]itles, mortgages, and other liens" were, at the date of the Compact, "good in" the ceding State, and ruled that, under § 3, the other State is bound to recognize such "[t]itles, mortgages, and other liens" to be "good in" its State, and not to claim ownership in itself. Iowa urges, in its Exceptions II and III, that this construction is erroneous and that §§ 2 and 3 should be construed as relating only to areas formed before July 12, 1943, that can be proved by clear, satisfactory, and convincing evidence to have been on the Nebraska side of the *original* boundary before the Compact fixed the permanent boundary. We overrule Iowa's Exceptions. Iowa's construction would require the claimant who proves title "good in Nebraska" also to shoulder the burden of proving the location of the *original* boundary before 1943, as well as proving that the lands were on the Nebraska side of that boundary. That, said the Special Master, and we agree, "would be placing a burden upon the land owner which the states themselves refused to undertake in 1943 and agreed would not be necessary. The states would in effect be saying to the land owners, 'we could not prove where the boundary was in 1943 but now, after we have waited 27

---

[6] Exceptions of the State of Nebraska, No. 6, p. 8, and No. 12, p. 11. Iowa concedes that the Exceptions are well taken. Iowa Reply 5, 7. The errors will be deemed corrected as suggested by the Exceptions.

years, we are going to make you prove where it was at your expense even though we know it is impossible.' " [7]

Iowa's Exceptions IV and V concern the Special Master's findings that the State of Iowa does not own Nottleman Island and Schemmel Island. The Special Master found that the proofs sufficed to establish title "good in Nebraska" to Nottleman Island and Schemmel Island, but did not suffice to prove title "good in Nebraska" to the other areas claimed by Iowa that were formed before 1943.[8] He found, and we agree, that titles "good in Nebraska" include private titles to riparian lands that under Nebraska law, differing from Iowa law, run to the thread of the contiguous stream. *Kinkead* v. *Turgeon*, 74 Neb. 573, 104 N. W. 1061 (1905), 74 Neb. 580, 109 N. W. 744 (1906).[9] He found further that titles "good in Nebraska" embrace titles obtained by 10 years' open, notorious, and adverse possession under claim of right without any requirement of a record title; under Iowa law, a claim must be under

---

[7] Report 88–89.

[8] *Id.*, at 174. The Special Master found, alternatively, that if his construction of §§ 2 and 3 was not accepted, nevertheless the landowners met the burden of proving that Nottleman and Schemmel Islands were actually on the Nebraska side of the original boundary. Since we agree with the Special Master's construction, we consider no Exceptions addressed to those findings.

[9] In Iowa's Reply, filed January 19, 1972, Iowa for the first time in this protracted litigation retracts its concession, made often and throughout the proceedings, that *Kinkead* established this principle of Nebraska law. In its Reply, at 15–16, Iowa contends that "the common law of the State of Nebraska did not in fact give the Nebraska riparian owners along the Missouri River title or ownership of the bed of the navigable channel of the river, and they acquired no property right to such bed until it was abandoned by the river." Our reading of the Nebraska cases satisfies us that the argument is frivolous.

"color of title," requiring some type of record title to commence the period of adverse possession.[10]

The Special Master recommended that as to areas formed before July 12, 1943, §§ 2 and 3 should be construed as limiting the State of Iowa to contesting with private litigants in state or federal courts the question whether the private claimants can prove title "good in Nebraska," and when private litigants prove such title, as obliging Iowa not to interpose Iowa's doctrine of state ownership as defeating such title.[11] We agree, and to that extent overrule Iowa's Exceptions IV and V. As to Nottleman Island and Schemmel Island, however, the Special Master recommended that, in addition to a judgment that titles "good in Nebraska" have been proved as to those islands, so that Iowa is precluded from claiming title thereto under its doctrine of state ownership, this Court should enjoin the State of Iowa, its officers, agents, and servants from further prosecution of the cases now pending in the Iowa courts.[12] We see no reason for an injunction at this stage. We are confident that the State of Iowa will abide by our adoption of the Special Master's conclusion that in any proceeding between a private litigant and the State of Iowa in which a claim of title good under the law of Nebraska is proved, the State of Iowa will not invoke its common-law doctrine of state ownership as defeating such title. Iowa's Exceptions IV and V are therefore sustained insofar as the Special Master recommended that an injunction issue.

Nebraska's basic Exception is to the Findings and Conclusion of the Special Master that ownership of areas that have formed since July 12, 1943, should be deter-

---

[10] Report 68–69. Claimants to titles to areas of Nottleman Island rested at least in part on the Nebraska law of adverse possession. Report 121–126.

[11] *Id.*, at 174–175.

[12] *Id.*, at 201; see n. 5, *supra.*

mined under the law of the State in which they formed, the boundary fixed by the Compact being the line that determines in which State they formed.[13] This pertains to the 21 areas and part of a 22d that lie north of Omaha. See n. 4, *supra*.

Although the Special Master recommended, and we agree, that claimants of title to these areas as against Iowa may also have the opportunity to show title "good in Nebraska" on the Compact date, July 12, 1943,[14] Nebraska offered no proof to support such a claim as to any of the areas. Nebraska does contend, however, that any accretions to Nebraska riparian lands that cross the Compact boundary line into Iowa, caused when the river moves gradually and imperceptibly, should be declared to accrue to the Nebraska riparian owner under Nebraska law, since under Nebraska law the boundary of the Nebraska owner moves with the thalweg or main navigable channel, regardless of which State the movement is in. The Special Master rejected that contention. We agree that the contention is without merit for the reasons stated in *Tyson* v. *State of Iowa,* 283 F. 2d 802 (CA8 1960). That was a condemnation action by the United States in which the question was the ownership of an island at Tyson Bend, one of the areas north of Omaha to which Iowa claims ownership. See n. 4, *supra*. The island had formed between the designed channel and a main channel created when the river escaped from the designed channel between 1943 and 1948. The island had then become connected to the Nebraska shore when the designed channel filled with sediment after a 1952 flood. The Corps of Engineers determined to dredge a canal in the designed channel to place the river back in the designed channel.

---

[13] *Id.,* at 193.

[14] *Id.,* at 192.

Condemnation of an easement on the island was necessary to carry the project forward, and the question of ownership of the island had to be settled to determine who was entitled to compensation. The Tyson claimants claimed the land as an accretion to Nebraska land or river beds belonging to them. The State of Iowa claimed it as an island formed over the state-owned river bed in Iowa under the Iowa doctrine of state ownership. The Court of Appeals for the Eighth Circuit held that the ownership of the island should be determined by the law of the State in which the land was situated, that is, by the law of Iowa, since the island was on the Iowa side of the Compact boundary. The Court of Appeals expressly rejected the same contention urged upon us by Nebraska, holding, in agreement with the District Court in the case, that "the Nebraska law of accretion did not operate to create riparian rights within the territorial limits of Iowa." 283 F. 2d, at 811. Hence, whether the Nebraska riparian owner has title to the accretions that cross the boundary into Iowa is determined by Iowa law. Nebraska argues that *Tyson* was wrongly decided. We do not agree. *Tyson* is consistent with what the Court said in *Arkansas* v. *Tennessee,* 246 U. S. 158, 175–176 (1918):

"How the land that emerges on either side of an interstate boundary stream shall be disposed of as between public and private ownership is a matter to be determined according to the law of each State, under the familiar doctrine that it is for the States to establish for themselves such rules of property as they deem expedient with respect to the navigable waters within their borders and the riparian lands adjacent to them. . . . *But these dispositions are in each case limited by the interstate boundary, and cannot be permitted to press back the boundary*

*line from where otherwise it should be located."* (Emphasis added.)

The States may submit a proposed decree in accord with this opinion. If the States cannot agree, the Special Master is requested, after appropriate hearing, to prepare and submit a recommended decree.

*It is so ordered.*