James Ricketts Executive Director Department of Corrections 6385 N. Academy Boulevard Colorado Springs, Colorado 80907
Dear Dr. Ricketts:
This opinion letter is in response to your March 13, 1980 letter in which you inquired about several issues concerning parole under H.B. 1589, 1979 Sess. Laws, ch. 157, which has become popularly known as the Gorsuch bill.
QUESTIONS PRESENTED AND CONCLUSIONS
1. Whether the Department of Corrections or the Parole Board is required to give prior public notice of all mandatory paroles under H.B. 1589, 1979 Sess. Laws, ch. 157 (hereinafter referred to as the Gorsuch bill); whether the department will have any responsibilities under public disclosure requirements; and whether the Parole Board will be required to give public notice of all determinations of earned time deduction for inmates under Sunshine Law requirements.
 My conclusion to all these issues is "yes." It is my opinion that the passage of the Gorsuch bill does not change any previously existing Sunshine Law responsibilities for either the Parole Board or the Department of Corrections, Division of Adult Services. Public notice and public disclosure of board proceedings should be provided as they were in the past. Similarly, the department should continue to give public notice concerning candidates for parole as it has done in the past.
2. Whether there is any legal basis for requiring inmates sentenced under the Gorsuch bill to submit a parole plan for community investigation and verification.
 My conclusion is that the Gorsuch bill does not remove the mandate for this particular practice. Parole plans should be submitted for community investigation and verification.
3. Whether inmates may be paroled to an interstate destination without prior acceptance by the receiving state, and whether inmates may proceed to interstate parole destinations where the receiving states fail to respond to requests for interstate parole prior to an inmate's release date.
 My conclusion is that an inmate may not be paroled to interstate destinations without the prior approval of the receiving state unless he is a resident of the receiving state or unless "he has his family residing within the receiving state and can obtain employment there" C.R.S. 1973, 24-60-302(1)(a). My conclusion regarding slow responses by receiving states is that inmates may not proceed to interstate destinations without prior approval by the receiving state unless they fit into one of the above-mentioned exceptions.
4. Whether any control may be exercised over inmate behavior during the last few months of incarceration in the form of removing good time earned by such inmates, and whether inmates receiving serious misconduct reports only days prior to scheduled release must be released as scheduled.
 My conclusion is that good time ordinarily may be used as a control device despite the vesting provisions of the Gorsuch bill. Inmates receiving misconduct reports within days of release ordinarily need not be set free as scheduled.
5. Whether inmates may be compelled to sign parole orders and whether the conditions of such will be enforceable given an inmate's refusal to sign such order, and whether the board should meet with each inmate to establish conditions of parole.
 My conclusion is that although inmates cannot be compelled to sign parole orders such orders are nonetheless enforceable where properly served upon an inmate. The better practice would be that of the board meeting with each inmate to determine the contents of the parole order.
6. Whether parolees may be indentured to pay supervision fees.
 My conclusion is that unlike work release inmates, parolees may not be assessed the cost of supervision.
7. Whether parolees who are returned to incarceration subsequent to parole revocation are entitled to good time deductions under C.R.S. 1973, 17-22.5-101 (1979 Supp.), and whether such good time applications would reduce the six month penalty to three months or whether they would instead be applied to the one year expiration date.
 My conclusion is that parolees returned to confinement pursuant to parole revocation are entitled to good time deductions. These deductions potentially reduce the six month incarceration period to three months; they are not applied to the parole expiration date.
ANALYSIS
H.B. 1589, 1979 Sess. Laws, ch. 157 has been codified as follows: C.R.S. 1973, 16-11-101(1)(h), 16-11-204.5(1), 16-11-302, 16-11-302.5,16-11-303, 16-11-304, 16-11-306, 16-11-307(1)(b), 16-11-309(1),16-11-310, 17-2-201(3)(f), 17-2-201(5)(a), 17-2-213, 17-22.5-101,17-22.5-102, 17-22.5-103, 18-1-102.5, 18-1-105(1),(6),(7),18-1-409(2.2), 18-1-409.5, 16-8-114(1), 17-22-103(1),18-1-108, and 18-8-208.1(5), all of which are contained in the 1979 Supplement. H.B. 1589, 1979 Session Laws, ch. 157 also repealed C.R.S. 1973, 16-11-101(1)(d) and 18-1-409(2.1) (1978 repl. vol.). Applicable portions of H.B. 1589 are discussed below.
1. While parole is mandatory under the Gorsuch bill, the time at which parole is granted is still, at least partially, committed to the discretion of the Parole Board. The Parole Board, by granting earned time to prisoners pursuant to C.R.S. 1973, 17-22.5-102 (1979 Supp.) can affect the time when parole is granted despite the fact that parole is mandatory. In addition, the Parole Board is still responsible for establishing the conditions of parole under C.R.S. 1973, 17-22.5-103 (1979 Supp.). For these reasons, the Parole Board must continue its present practice of giving public notice under the Sunshine Law. The Division of Adult Services will be responsible for the supervising and monitoring of inmates on parole and for "assistance in securing employment, housing and such other services as may effect the successful reintegration of such offender into the community while recognizing the need for public safety." C.R.S. 1973, 17-22.5-103 (1979 Supp.) Therefore, responsibilities for public disclosure should remain as they were under the old law with the department giving notice of all inmates scheduled to be paroled.
Parole Board determinations of earned time credit under the Gorsuch bill are subject to the same Sunshine Law procedure as Parole Board determinations of whether or not to grant parole under the old law. The granting of earned time under the Gorsuch bill has basically supplanted the Parole Board function under the old law of granting parole within the parameters of indeterminate sentences. When the Parole Board meets to grant or deny earned time to inmates, these meetings must be open and subject to every other requirement of C.R.S. 1973, 24-6-402 (1979 Supp.).
2. Given the purpose of parole and the function of the Division of Adult Services under C.R.S. 1973, 17-22.5-103 (1979 Supp.), there is undoubtedly a basis for requiring the submission of a parole plan to "effect the successful reintegration of the offender into the community." However, the only sanction that the board could impose for an inmate's refusal to submit such a plan would be to withhold earned time that would otherwise be awarded. The Division of Adult Services should provide notification to persons who could be adversely affected by the prisoner's release on parole.
3. Under the interstate compact given effect in C.R.S. 1973,24-60-302, a parole to an interstate destination may only be performed with the prior consent of the receiving state unless the inmate "is in fact a resident of or has his family residing within the receiving state and can obtain employment there." C.R.S. 1973, 24-60-302(1). In other words, consent of the receiving state is not needed where the inmate: 1) is a resident of the receiving state having been an actual inhabitant of the receiving state continuously for more than one year prior to his coming to Colorado and has not resided in Colorado more than six months immediately preceding the commission of the offense for which he has been convicted in Colorado, or
2) where the inmate has family members residing in the receiving state and can obtain employment in that area. C.R.S. 1973,24-60-302(1). In all other cases, the prior consent of the receiving state will be necessary with the receiving state being given a prior opportunity to perform an investigation of the home and prospective employment of the inmate. Needless to say, no inmate may be paroled to any state not a party to this interstate compact even if the inmate is a resident or has immediate family members and a prospective job in that state.
The compact thus creates two exceptions to the rule that prior approval must be obtained from a receiving state before paroling persons to that state. Under the compact, it is presumed that such receiving states have already consented to the paroling of residents to their jurisdiction, or of persons having family ties and employment prospects in their state. Under the letter of the compact, receiving states do not have the discretion to deny the transfer of such parolees to their jurisdiction. The residency exception permitting the placement of residents of receiving states is clearly spelled out by the compact. C.R.S. 1973,24-60-302(1). However, the family/employment exception is ambiguous as the compact does not state specifically what family ties or job opportunities are needed for an interstate placement. Conceivably, the compact permits the unapproved placement in the receiving states of parolees with minimal family ties and employment prospects in those states. However, it would be unwise to impose such parolees upon receiving states without prior approval due to the reciprocal effects of interstate compacts.
It has been established that the determination of rights under an interstate compact is a federal question ultimately involving adjudication by the United States Supreme Court. Nebraskav. Iowa, 406 U.S. 117 (1972). No one party to an interstate compact may unilaterally nullify the compact or impose any unilateral interpretation upon it. West Virginia v.Simms, 341 U.S. 22 (1951). However, compacts relating to criminal justice are to be construed in the interests of comity, reciprocity, and the enforcement of internal criminal laws. See New York v. O'Neill, 359 U.S. 1
(1959). Because of the reciprocal effects of the compact, it is recommended that the Department of Corrections not parole to other jurisdictions nonresidents with minimal family ties or poor prospects for employment in the receiving state unless the receiving state gives prior approval.
Presumably, the Department of Corrections does not wish to have such parolees from other jurisdictions imposed upon Colorado without prior approval. Although the ultimate sanction a state may exercise is renunciation of the compact, C.R.S. 1973,24-60-302(7), as a practical matter other states may simply employ the reciprocal effects of such compacts and impose upon Colorado parolees who would have only minimal family ties and poor prospects for employment.
In situations where an inmate is paroled to another participating state without the prior consent of that state due to the existence of residency or family ties and employment, the receiving state must still be notified in order that their parole authorities can assume supervision of the parolee. However, in cases of prospective parolees who need the permission of the receiving state in order to be paroled there, a failure of a receiving state to respond to a request can only be construed as a denial of such permission, requiring the inmate to remain in Colorado until permission is granted. We cannot construe silence as consent as the compact clearly provides for receiving states to have an opportunity to investigate the job and home situation of the parolee prior to acceptance, C.R.S. 1973, 24-60-302(1).
4. Under Ex parte Blocker, 69 Colo. 259, 193 P. 546
(1920), all good time statutes must be construed in a manner favoring the liberty of inmates. See also Peoplev. Incerto, 38 Colo. App. 390, 557 P.2d 1217 (1976). The effect of this principle upon our good time statute is that of presumptively entitling inmates to good time unless the state can show otherwise. Practically speaking, this means that good time must be awarded on a projected basis, reducing the time during which the inmate will remain incarcerated based on his anticipated good behavior. Absent misconduct on the part of the inmate, our good time statute in effect halves his incarceration period.
Under the Gorsuch bill, good time and, consequently, release dates, must be projected before the good time is vested. However, nothing in either the new statutes or case law prevents the department from denying, for cause, projected good time prior to the vesting of such good time. With current good time projecting practices, the final vesting of good time entitling the inmate to a particular release date ordinarily should not occur until the inmate serves the last day of the projected sentence. Thus, up until he has served his last day of incarceration, the inmate may ordinarily have up to 45 days added to his projected discharge date. In effect, this could add up to 45 days to the time at which he is released.
Due to the projection system, an inmate will usually have projected but invested good time up until the moment of his release. Thus, inmates in the final quarter or even final day of incarceration can be subject to penalties of up to 45 days loss of good time for rule infractions. The exception to this rule exists only where all non-vested good time has been taken from the inmate and he is simply serving the time imposed upon him as a sanction for violating the Code of Penal Discipline. Further good time sanctions would be unavailable as there would be no non-vested good time to remove.
5. We cannot compel an inmate to physically sign any document, nor can we make release on parole conditional upon signing such a document. However, the board could certainly impose reasonable conditions upon the parolees, and serve him with notice of such conditions under C.R.S. 1973, 17-2-103. The reasonableness of such parole conditions would be determined by their relationship to the purposes of parole as set out by C.R.S. 1973, 17-22.5-103
(1979 Supp.). Courts will, however, generally defer to the discretion of the board in establishing conditions of parole.Wilkerson v. Patterson, 174 Colo. 264,483 P.2d 365 (1971).
In establishing such conditions, the far better practice would be for the board to meet with each inmate. Under the Gorsuch bill, the two primary functions of the Parole Board will be the assessing of earned time and the establishing of conditions for parolees. It would be inconsistent with the legislative intent of C.R.S. 1973, 17-22.5-103 (1979 Supp.) for the board to arbitrarily establish conditions without affording a prospective parolee an opportunity to object to, or request modification of, such conditions.
6. Unlike either county jail or community corrections work release program, C.R.S. 1973, 17-26-128(4) and 17-27-107(1), there is no express statutory provision entitling the DOC or the Parole Board to collect fees from parolees. In addition, community corrections can be distinguished from parole in that it consists of a voluntary contractual relationship between the DOC and the prisoner. In contrast, the Gorsuch bill mandates that every person sentenced for a class 2, 3, 4 or 5 felony serve one year on parole. Since parole is mandatory and since there are no express provisions for collection of fees by the DOC, parolees may not be indentured to pay supervision fees.
7. By statute, parolees returned to confinement pursuant to parole revocation are entitled to good time deductions. C.R.S. 1973, 12-22.5-103 (1979 Supp.). These deductions work in the same manner as discussed on pages 6-7, supra, potentially reducing the six month period of reincarceration to three months. The question remains, however, whether such good time credits also apply to an individual's parole discharge date.
In analyzing whether good time credits obtained during reincarceration shall be applied to the parole discharge date, it is first necessary to determine whether under any circumstances good behavior may reduce the mandatory one year on parole. If a well-behaved parolee who is never subject to reincarceration is not entitled to a reduction of this year on parole, it follows logically that the parole violator should not be entitled to benefit from his wrong by having good time credits, received during reincarceration, apply against his parole discharge date. Such an application of good time credits would permit the violator to discharge his parole more rapidly than the nonviolator. Practically speaking, the parole violator is certainly more in need of supervision than the well-behaved parolee and consequently should not be entitled to an earlier discharge. If, however, parolees are to be afforded good time credits against their discharge date for good behavior while at liberty on parole, it could be argued that reincarcerated parole violators should also be able to reduce their ultimate parole discharge dates during the time spent in confinement. Therefore, this analysis requires that we first determine whether the Gorsuch bill entitles parolees to good time credits while at liberty.
Under the Gorsuch bill, the legislative intent is apparently to afford good time only to inmates confined in correctional facilities. Statutory language in C.R.S. 1973, 17-22.5-101 (1979 Supp.) restricts good time awards to the inmate who observes the rules of the institution "in which he has been confined." The statute addressing parole, C.R.S. 1973, 17-22.5-103 (1979 Supp.), states: "The good time deduction authorized by section 17-22.5-101
shall apply to periods of reincarceration provided for in this section." This language indicates a legislative intent to have good time credits reduce only periods of incarceration and not the one year parole period.
C.R.S. 1973, 17-2-206 (1979 Supp.), however, provides that a parolee is entitled to good time credits while at liberty on parole as well as during periods of reincarceration. This statute unquestionably applies to parolees sentenced for a crime committed before July 1, 1979. Such parolees are hereinafter referred to as "pre-Gorsuch parolees." The issue is whether section 17-2-206 also applies to parolees convicted of class 2, 3, 4 or 5 felonies occurring on, or after July 1, 1979. Such persons will hereinafter be referred to as "Gorsuch parolees."
Arguably, section 17-2-206 may apply to both Gorsuch and pre-Gorsuch parolees alike as there is no express limitation on its applicability and it is not necessarily inconsistent with the provisions of C.R.S. 1973, 17-22.5-101, et seq. (1979 Supp.). See generally, People v. DistrictCourt, 196 Colo. 249, 585 P.2d 913 (1978). Such an interpretation would enable parolees under the Gorsuch bill to discharge a year's parole in six months.
C.R.S. 1973, 17-2-213 (1979 Supp.), enacted as part of the Gorsuch bill, provides:
 Effective July 1, 1979, the provisions of this part 2 relating to the power of the state board of parole to grant parole and to establish the duration of the term of parole shall apply only to persons sentenced for conviction of a felony committed prior to July 1, 1979, persons sentenced for conviction of a misdemeanor, persons sentenced for conviction of a sex offense, as defined in section 16-13-202 (5), C.R.S. 1973, or a class 1 felony, and persons sentenced as habitual criminals pursuant to section 16-13-101, C.R.S. 1973. Parole for persons sentenced for conviction of a class 2, class 3, class 4, or class 5 felony committed on or after July 1, 1979, shall be as provided in section 18-1-105, C.R.S. 1973, and article 22.5 of this title.
(Emphasis added.)
In my opinion, the emphasized portion of the above-cited statute evidences an intent to prevent the application, to Gorsuch parolees, of considerations affecting the duration of parole found in article 2 of title 17. It evidences an intent to have the duration of parole for Gorsuch parolees controlled exclusively by the provisions of article 22.5 of title 17 and article 1 of title 18. Unlike article 2 of title 17, neither article 22.5 of title 17 nor article 1 of title 18 provide for good time credits for parolees at liberty. The only good time provided by these latter two articles is for those persons confined in correctional facilities. Therefore, it is my opinion that C.R.S. 1973, 17-2-213 (1979 Supp.) should be interpreted as precluding the application of C.R.S. 1973, 17-2-206 (1979 Supp.) to Gorsuch parolees.
It may be argued that this interpretation constitutes an unwarranted expansion of section 17-2-213. However, legislative intent is the controlling factor in statutory construction.Cross v. People, 122 Colo. 469, 223 P.2d 202 (1950);Alvarez v. District Court, 186 Colo. 37, 525 P.2d 1131
(1974).
 The intention of an act is the vital part or essence of it, and the cardinal rule in construing a statute is to ascertain the purpose and intent of the legislature in passing it, and to give it every possible construction that will render it effective and accomplish such intent, if it can be ascertained and reasonably inferred by permitted legal means.
Martinez v. People, 111 Colo. 52, 137 P.2d 690, 693
(1943). In Cooper Motors v. Board of CountyCommissioners, 131 Colo. 78, 279 P.2d 685, 688 (1955), the court, echoing the same sentiment, reiterated the principle that "The intent of the statute is the law, and general words may be restrained to it, and those of a narrower import may be expanded to embrace it to effectuate that intent."
In my opinion, it was the intent of the legislature to place Gorsuch parolees on definite one year parole periods unaffected by either good time credits or the discretion of the Parole Board, factors which were characteristic of the old sentencing scheme. Pre-Gorsuch sentencing entailed indeterminate periods of incarceration with the Parole Board having broad discretion as to when a prisoner would begin and complete his period of parole supervision. Prior to the passage of the Gorsuch bill, the Parole Board had authority to set the duration of the term of parole within the time remaining on the sentence or a five year period, whichever was less. C.R.S. 1973, 17-2-201(5)(a), (6) (1979 Supp.). Good time credits functioned, in part, as a means of offsetting the discretion of the parole board to keep persons under parole supervision for relatively long periods of time. Under Gorsuch, the responsibility of the Parole Board to set the period of parole has been abrogated by the legislature's judgment that a one year period is appropriate for class 2-5 felony offenders to achieve adequate supervision of their efforts to reintegrate themselves into society. Since the parole periods cannot, in any way, be lengthened by the Parole Board for Gorsuch parolees, the function of good time as a means of reducing long periods of parole no longer exists.
The Gorsuch bill represents a dramatic change in penal and parole philosophy by which the legislature abandoned the old concept of a single indeterminate period in which the convict served both hard time and parole. Under the old system it was clearly intended that the convict be able to continually reduce, through good behavior, the discharge date of his sentence regardless of whether he was on parole or incarcerated. In either event he was deemed to be serving the same sentence which consisted of both incarceration and parole within a single time frame. Upon proof of parole violations, pre-Gorsuch parolees were returned to confinement to serve out their indeterminate sentences. C.R.S. 1973, 17-2-206 (1979 Supp.). However, no such serving out of the original sentence is required of Gorsuch parolees. With the Gorsuch bill, the legislature created two separate and distinct determinate periods, one for confinement and one for parole, with the Parole Board having no discretion as to the duration of the latter period. Thus it was clear that the legislature intended to create a scheme in which parole would consist of a full calendar year unaffected by either good time credits or the Parole Board's discretion. This intent is further manifested by the provisions of C.R.S. 1973, 17-22.5-103 (1979 Supp.) mandating that
 for . . . subsequent revocations of parole, the offender shall be reincarcerated, but in no event shall any person spend more than one year under parole supervision and reincarceration as provided in this section and section 18-1-105, C.R.S. 1973.
It is my conclusion that this mandatory one year parole period is not to be reduced by good time credits obtained during reincarceration. The legislative intent underlying the enactment of the Gorsuch bill was that of providing a mandatory one year parole period. Since well-behaved parolees are not entitled to a reduction of this parole period, parole violators may not expect to reduce their mandatory one year parole period by virtue of their violations and subsequent reincarceration.
SUMMARY
Public disclosure, public notice, and parole planning responsibilities are not diminished by the Gorsuch bill. The content of parole orders and agreements remain within the board's discretion.
Interstate placement of parolees will be controlled by the language of the interstate compact; where ambiguous, that language should be interpreted with deference to comity and reciprocity. Receiving states should be contacted for approval in all cases where there is any doubt concerning the sufficiency of the parolee's employment and family ties to that state. Such parolees should remain in Colorado unless the receiving state expressly acknowledges that it will accept them.
Good time deductions will be available to Gorsuch parolees only upon reincarceration. Such deductions will not reduce the mandatory one year of parole. Removals of good time credits ordinarily may be employed at any time to deter misconduct by incarcerated prisoners or reincarcerated parolees.
Very truly yours,
 J.D. MacFARLANE Attorney General
INTERSTATE COMPACTS INTERGOVERNMENTAL COOPERATIONS PRISONERS FELONS INMATES CORRECTIONS CORRECTIONAL FACILITIES PROBATION AND PAROLE NOTICES OPEN MEETINGS FEES
C.R.S. 1973, 24-60-302
C.R.S. 1973, 17-22.5-101
C.R.S. 1973, 17-22.5-102
C.R.S. 1973, 17-22.5-103
C.R.S. 1973, 24-6-402
C.R.S. 1973, 17-2-103
C.R.S. 1973, 17-26-128
C.R.S. 1973, 17-27-107
C.R.S. 1973, 17-2-213
C.R.S. 1973, 17-2-206
C.R.S. 1973, 17-2-201
CORRECTIONS, DEPT. OF Administration
Traditional public disclosure, public notice and parole planning responsibilities are not diminished by the Gorsuch Bill. The content of parole orders and agreements remain within the board's discretion. Interstate placement of parolees will be controlled by the language of the interstate compact; where ambiguous, that language should be interpreted with deference to comity and reciprocity. Receiving states should be contacted for approval in all cases where there is any doubt concerning the sufficiency of the parolee's employment and family ties to that state. Such parolees should remain in Colorado unless the receiving state expressly acknowledges that it will accept them. Good time deductions will be available to Gorsuch parolees only upon reincarceration. Such deductions will not reduce the mandatory one year of parole. Removals of good time credits ordinarily may be employed at any time to deter misconduct by incarcerated prisoners.