Wilfred W. NIELSEN and Deanna Nielsen, Appellees,

v.

Herman STRATBUCKER, et al., Defendants;

State of Iowa, Appellant.

No. 66110.

Supreme Court of Iowa.

Oct. 27, 1982.

Thomas J. Miller, Atty. Gen., and Elizabeth M. Osenbaugh, John P. Sarcone, Eliza Ovrom, Asst. Attys. Gen., for appellant.

Robert G. Scoville of Ryan & Scoville, South Sioux City, Neb., for appellees.

Considered by REYNOLDSON, C.J., and UHLENHOPP, HARRIS, McGIVERIN, and LARSON, JJ.

McGIVERIN, Justice.

This is a quiet title action seeking to determine ownership of 7.87 acres of land formed by accretion to Bullard Bend along the Missouri River in Harrison County. We granted further review to the defendant, State of Iowa, from the court of appeals decision affirming the district court's decree which quieted title of the accreted land in the riparian owners, plaintiffs Wilfred and Deanna Nielsen. We find that title to the 7.87 acres should have been quieted in the State rather than the Nielsens. Therefore, we vacate the court of appeals decision and reverse the trial court decree. The case is remanded to the district court with directions that title be quieted in the State based on its counterclaim.

Plaintiffs are riparian owners of land on the east bank of the Missouri River. By virtue of rights acquired through deeds from their predecessors in title, plaintiffs claim title to 7.87 acres of the accreted land. Plaintiffs filed a petition to quiet title to this land in them and the State filed a counterclaim asking that the title be quieted in it. The district court entered a decree in favor of plaintiffs and dismissed the counterclaim.

The State appealed and we transferred the case to the court of appeals. After an adverse decision there, we allowed the State's application for further review.

Our review of this equity action is de novo. We give weight to fact findings of the trial court but are not bound by them. Iowa R.App.P. 14(f)(7).

▉ The dispute is almost entirely factual, and the applicable law is well settled and generally agreed upon by the parties. Therefore, we set forth the law which will govern our determination of the disputed facts.

(1) Accretion results from a gradual and imperceptible addition to the shore-

line by action of the water to which the land is contiguous. Land may accrete to an island or to the riverbed itself as well as along the shoreline.

(2) One who owns land fronting on a navigable stream owns to the ordinary high water mark. The term "ordinary high water mark" has been defined as being "co-ordinate with the limit of the bed of the water, and that, only, is to be considered the bed which the water occupies sufficiently long and continuously to wrest it from vegetation and destroy its value for agricultural purposes."

(3) The State owns the river bed from the ordinary high water mark to the center or thread of the stream. Land which accretes to an island in a navigable stream or to the bed of the stream itself becomes the property of the State.

(4) Land which accretes at or above the ordinary high water mark becomes the property of the landowner to whose shore it attaches.

(5) The right to accreted land is the same whether it results from natural causes or from artificial means over which the owner has no control.

[6] An island is traditionally defined as a body of land completely surrounded by water. However, before an island can support a claim of ownership by accretion it must be able to show some permanence of its own.

[7] Ordinarily, in order to entitle a riparian owner to accretions they must begin to form from his land, and not from some other point so as eventually to reach his land.

[8] [N]o title by accretion occurs until the land surfaces above the water at the ordinary high water mark.

*Mather v. State,* 200 N.W.2d 498, 500, 501, 503 (Iowa 1972) (citations omitted).

Unfortunately, the facts to which these principles must be applied cannot be stated with such simplicity. The parties support their contentions with voluminous oral testimony and also numerous plats, maps, photographs and other exhibits. We have reviewed all of this evidence and find the following facts.

The wild meanderings of the Missouri River posed a continual problem in earlier years.[1] Various efforts were made to control the river's wanderings but failed for one reason or another. In the late 1950's the United States Corps of Engineers made yet another attempt to stabilize the Missouri River; this dispute centers on land which resulted from the Corps' stabilization attempts.

The Corps constructed a series of pile dikes and revetments whose purpose was to narrow, deepen and stabilize the channel. The dikes were constructed, starting from the bank, by driving clumps of wooden pilings into the river bed and then dumping rock along the pilings to form a dike. The purpose of the structures was to push the river into its design channel. To accomplish this purpose the dikes were constructed so that, after completion, they would extend out into the river at right angles to the bank, and any water immediately downstream from them would be dead or slack water. The action of the river against these dikes would cause accretion land to form near them. The disputed 7.87 acres formed south of dike 719.6, which was attached to plaintiffs' high bank riparian land.

1. Prior to the design channel, the boundary between Iowa and Nebraska, by decree of the United States Supreme Court, was "a varying line" so far as affected by "changes of diminution and accretion in the mere washing of the waters of the stream," but "the boundary remained as it was prior to ... shifts by avulsion, the center line of the old channel ..." *Nebraska v. Iowa,* 143 U.S. 359, 370, 12 S.Ct. 396, 400, 36 L.Ed. 186, 190 (1892); decree at

145 U.S. 519, 12 S.Ct. 976, 36 L.Ed. 798 (1892). The Supreme Court decree proved unworkable, and in 1943 Iowa and Nebraska agreed by compact upon a permanent boundary line location regardless of natural changes of the river or changes resulting from work by the Corps. *Nebraska v. Iowa,* 406 U.S. 117, 119, 92 S.Ct. 1379, 1381, 31 L.Ed.2d 733, 736 (1972). See Eriksson, *The Boundaries of Iowa,* 25 Iowa J. of Hst. and Pol. 163, 233–35 (1927).

Testimony concerning progression of the construction of dike 719.6, and formation of the sandbar behind it, is conflicting. It is clear, however, that when construction began in June 1959 the channel of the Missouri River was located along the Iowa bank and no sandbars existed in the area south of dike 719.6. The dike was completed in June 1960. Aerial photographs taken on July 31, 1960, indicate clearly visible sandbars north and south of dike 719.6 which formed initially on the bed of the river. Within one year's time the effect of the dike had been to create a sizable sandbar and to eliminate all live water along the Iowa bank. Slack water, however, continued to lie along the east bank and between the sandbar and the dike until the process of accretion worked a complete closure of the old channel.

There is little evidence concerning the land in dispute between 1960 and 1965, which were crucial years in the land's formation. What the evidence does show is that in the early 1960's the land was low and muddy, but cattle could be grazed on it. Water did fill the swale along the east bank in 1975 and 1978, years of abnormally high water. Since 1978, the land has been cultivated.

■ The burden of proof is on a plaintiff in a quiet title action, *Chicago and N.W. Ry. Co. v. Sioux City Stock Yards,* 176 Iowa 659, 663, 158 N.W. 769, 770 (1916), and the plaintiff must quiet title on the strength of his own title and not rely on the weakness of another's. *State v. Simmons,* 290 N.W.2d 589, 592 (Iowa), *cert. den.,* 449 U.S. 842, 101 S.Ct. 123, 66 L.Ed.2d 50, *reh. den.,* 449 U.S. 1103, 101 S.Ct. 902, 66 L.Ed.2d 831 (1980). In order for a riparian owner to claim title to land as accretions he must show that the accretion land formed slowly, gradually, and imperceptibly from

his riparian land. *McFerrin v. Wiltse,* 210 Iowa 627, 629, 231 N.W. 438, 439 (1930).[2]

In making our determination as to whether title to accretion land vests in the riparian owner or the State, we must be cognizant of *where* the accretions initially formed. *Mather,* 200 N.W.2d at 503; *Solomon v. Sioux City,* 243 Iowa 634, 638, 51 N.W.2d 472, 475 (1952). That our initial factual determination must focus on the point of origin is required by well established accretion law: (1) "[t]he State owns the river bed from the ordinary high water mark to the center of the thread of the stream," and (2) "to entitle a riparian owner to accretions, they must begin to form from his land . . . ." *Mather,* 200 N.W.2d at 500, 503. Consequently, in order for accretions to begin to form from the riparian owner's land, they must begin to form above the high water mark—accretions forming along a river bank below the high water mark do not "begin to form from [the riparian owner's] land."

■ Turning our attention to the facts of the present case, we find that the accretions first formed as a sandbar on the bed of the river below dike 719.6. There was no question that at this point in time the State owned these alluvial deposits lying below the high water mark. See *Simmons,* 290 N.W.2d at 592. The sandbar did not become an island before the process of accretion started to build up alluvial deposits along the bank. *Cf., Mather,* 200 N.W.2d at 503. The absence of an island, however, does not vest title in accretion land, formed by alluvial deposits to a sandbar and the bank, in the riparian owner. We adhere to the general rule that accretions belong to the land from which they begin. See 65 C.J.S., *Navigable Waters* § 82(4) at 260 (1963).

**2.** The length of time during formation of the accretion land is not material. *Sieck v. Godsey,* 254 Iowa 624, 627, 118 N.W.2d 555, 557 (1962). In *Coulthard v. Stevens,* 84 Iowa 241, 245, 50 N.W. 983, 985 (1892), we adopted the following definition of accretion:

Accretion, to vest a title in the owner of the abutting shore, must be so slow that its increase should be imperceptible. To acquire

title to land as alluvion, it is necessary that its increase should have been imperceptible, that is, that the amount added in each moment of time should not be perceived. It has been said: "it is enough if it were done so that they could not perceive the progress at the time it was being made."
(citations omitted).

Although the sandbar originated in the bed of the river, plaintiffs contend that when the sandbar arose above the high water mark it was then attached to the riparian bank and became the property of the plaintiff riparian owners. Title, however, does not leap frog from the State to the riparian owner merely because a sandbar arising above the high water mark is also eventually attached to the riparian shore. In order to sustain his burden of proof the riparian owner must show that the accretions first formed along land to which he or his predecessor had title.[3] This plaintiffs failed to do. On the other hand, the State has shown that it owned the disputed land from its inception to time of trial.

We have considered all of the evidence and the contentions of the parties. For the reasons heretofore stated, we vacate the decision of the court of appeals and reverse the decree of the district court. We remand the case to the district court with directions that plaintiffs' petition be dismissed and that title be quieted in the State based upon its counterclaim.

REVERSED AND REMANDED.

**3.** We are aware of the difficult burden of proof borne by the riparian owner. In part this is due to the quirks of our long-established accretion law—an ancient doctrine adopted from the civil law by thirteenth century English jurists. Comment, 45 Iowa L.Rev. 945, 948 (1960). To a larger extent, the riparian owner's problem in sustaining his burden of proof is due to the volatile nature of Iowa's rivers, especially the Missouri River, which makes factual determinations of the point of origin extremely difficult in most cases. The beds of Iowa's rivers are composed of very erodible material which increases the alluvial content of the water and causes land to accrete at a fast rate. Id. at 951. In this case, for example, the 1959 aerial photograph shows no indication of a sandbar below dike 719.6, while the 1960 aerial photograph shows that a substantial part of the land in dispute had already been formed. Application of the doctrine of accretion to the Missouri River has never been easy, and the present case is no exception. See Underhill, *Determination of Rights to Real Property Along the Missouri River in Connection with River Stabilization*, 42 Iowa L.Rev. 58 (1956). The river's character, in conjunction with Iowa's accretion law, makes it extremely difficult for the riparian owner to prove that the point of origin of the accretion land was the riparian bank above the high water mark. This, however, is not inconsistent with the functional purposes of the accretion doctrine: determination of title in land formed by gradual and imperceptible alluvial deposits.