**STATE of Iowa, Plaintiff-Appellant,**

v.

**F. Pace WOODS, et al.,
Defendants-Appellees.**

**No. 2–66153.**

Court of Appeals of Iowa.

Jan. 26, 1983.

Thomas J. Miller, Atty. Gen. and Elizabeth M. Osenbaugh, John P. Sarcone and Eliza Ovrom, Asst. Attys. Gen., for plaintiff-appellant.

Howard D. Wenger of Wenger Law Office, Hamburg, for defendants-appellees Woods and Smiths.

Edwin Clarke Getscher of Getscher & Getscher, Hamburg, and John Redd, Sidney, for defendant-appellee Fred A. Walker.

SNELL, Judge.

This appeal by plaintiff State of Iowa arises from an action commenced in 1963 attempting to quiet title to land in the State located in Fremont County, Iowa. The land, known as Walker-Engleman Island or State Line Island, totaling 264 acres, was a portion of a Missouri River island and an adjacent abandoned channel of the river. The Iowa-Missouri border, as extended across the island, formed the property's southern boundary. The remainder of the island was purportedly in Missouri although Nebraska asserted some claim to it. The land was subject to the Iowa-Nebraska Boundary Compromise of 1943 and the case was stayed pending the outcome of *Nebraska v. Iowa*, 406 U.S. 117, 92 S.Ct. 1379, 31 L.Ed.2d 733 (1972), decree reported in 409 U.S. 285, 93 S.Ct. 889, 34 L.Ed.2d 522 (1973), a case involving the interpretation of that agreement.

Three groups of defendants claimed different portions of the land in the dispute in counterclaims against the plaintiff. Fred Walker claimed that he and his predecessors adversely possessed the island portion of the

land between 1930 and 1943. Defendants Lucian and Zola Smith claimed that they adversely possessed forty acres of Walker's claim on the island portion after 1956. Defendants F. Pace Woods, Olive Black Woods, Mark W. Woods, Marjorie William Woods, Ivan and Sharon Woltemath and State Line Farm Co. claimed half of the abandoned east channel as an accretion to their land on the Iowa high bank.

The plaintiff presented evidence at trial in an attempt to show that the island formed by 1926 within the Iowa portion of the Missouri River. The defendants presented evidence indicating that the island formed by 1923 on the Nebraska side of the river.

Fred Walker testified that his father and grandfather went onto the island as squatters in 1930. Walker and his grandparents resided on the property until they left because of a flood in 1943. They remained off the island until 1955 although Walker claimed that various acts of ownership were done by them between 1943 and 1955. Walker said that his parents built a cabin just north of the Iowa line in 1932, but that they moved off the island in 1936. Evidence was presented concerning the family's activities on the island after 1936. The family paid Missouri property taxes but not Iowa and Nebraska property taxes. Walker's first record title to the Iowa portion of the island was recorded in 1962. Walker also presented evidence of a claim to the island by virtue of Nebraska law.

The Smiths presented evidence to support their claim to the western portion of the island. Lucian Smith testified that he went onto the island in 1956 under an agreement with F. Pace Woods to clear the island in return for half the land cleared. In the early 1960's, Smith and Walker entered into a boundary agreement which was formalized in 1977.

The Woods defendants claimed a portion of the abandoned river channel east of the island as an accretion to their high bank land. There is conflicting evidence concerning whether the land in question formed as an accretion to the high bank land and whether the accretion was above the high water mark.

The trial court quieted title in the defendants to the areas described in their counterclaims. The court concluded that pursuant to *Nebraska v. Iowa,* the plaintiff was barred from showing the original state boundary prior to the 1943 compromise with respect to lands whose titles were good in the states on that date. The court also determined that even though it was not necessary to determine the prior boundary, the plaintiff failed to establish that the land emerged on the Iowa side.

The court found that Walker had established title to the island—which was good in Nebraska—by the date of the compromise under the theory of adverse possession. The court also concluded that the doctrines of laches, equitable estoppel, and unclean hands should be applied against the plaintiff for permitting the possessors of the Iowa portion of island to have possession and make improvements without bringing a suit. The Smith defendants were decreed to have title to a portion of the property by adverse possession. The court also found that the abandoned river channel had accreted to the island and to the Iowa high bank land, vesting title in the defendants.

Our review of this quiet title action tried in equity to the district court is de novo. *Moser v. Thorp Sales Corp.,* 312 N.W.2d 881, 886 (Iowa 1981). While we are not bound thereby, we give weight to the findings of the trial court. Iowa R.App.P. 14(f)(7).

The case of *Nebraska v. Iowa* arose to obtain a construction of the Iowa-Nebraska Boundary Compact of 1943. The Compact was deemed necessary because "the fickle Missouri River . . . refused to be bound by the Supreme Court decree of 1892." In its opinion of 1972 the Supreme Court observed that during the prior thirty-five year period the river had changed its course so often that it proved impossible to apply the court decision in all cases, since it is difficult to determine whether the channel of the river has changed by the law of avulsion or that

of accretion. The special master found, and the Supreme Court adopted his findings, that by 1943 the shifts of the river channel had been so numerous and intricate both in its natural state and as a result of the Corps of Engineers work, "that it would be practically impossible to locate the original boundary line." 406 U.S. at 119, 92 S.Ct. at 1381, 31 L.Ed.2d at 736. The original boundary line was established in 1892 as a varying line so far as was affected by changes of diminution and accretion "in the mere washing of the waters of the stream" but not where the river is shifted by avulsion. Obviously by 1943 the "mere washing" had created many problems not easily decided by applying the Supreme Court's maxim. The Compact, by fixing the boundary as the center line of the proposed stabilized channel as established by the U.S. Engineers Office, resulted in some lands formerly in each State being located within the other state. The Compact also provided that Iowa and Nebraska ceded to each other lands now located within the Compact boundary of the other. Titles good in the ceding state were to be good in the other state.

 Plaintiff sought to prove its ownership with voluminous testimony and over 200 exhibits, consisting of aerial photographs, surveys, and maps of the Missouri River, where Walker-Engelman Island evolved. Plaintiff's claim in the instant case rests, as it did in *Nebraska v. Iowa,* on the Iowa common law that private titles to riparian lands run only to the ordinary high water mark on navigable streams and that the state owns the beds of all navigable streams within the state. Thus, the State is the owner of any islands that form therein. *See Nielsen v. Stratbucker,* 325 N.W.2d 391 (Iowa 1982) (summary of Iowa law). Of course, to apply the Iowa law the land must be Iowa land. *See Nebraska v. Iowa,* 406 U.S. at 126, 92 S.Ct. at 1385, 31 L.Ed.2d at 740. The parties agree that the land is in Iowa now but do not agree that it always was. Defendants claim that the land was "ceded" under the compact. Although defendants did not actually plead the law of Nebraska in the instant case, we deem it

established by *Nebraska v. Iowa.* That case held that "ceded lands" described all areas formed before July 12, 1943, regardless of their location with reference to the original boundary whose titles were good in the ceding state. The other state was bound to recognize such titles to be good in its state and not to claim ownership in itself. Iowa urged a construction of the Compact, rejected by the Supreme Court, which would have required proof that these lands were on the Nebraska side of the original boundary before the compact fixed the permanent boundary. The Court noted that Iowa's construction would have required a claimant to shoulder the burden of proving the location of the original boundary before 1943 as well as proving that the lands were on the Nebraska side of that boundary. The Court found that this would be placing a burden upon the landowner that the states themselves refused to undertake in 1943:

> The States would in effect be saying to the land owners, 'we could not prove where the boundary was in 1943 but now, after we have waited 27 years, we are going to make you prove where it was at your expense even though we know it is impossible.'

406 U.S. at 122, 92 S.Ct. at 1383, 31 L.Ed.2d at 738.

 *Nebraska v. Iowa* further established that "titles 'good in Nebraska' include private titles to reparian lands that under Nebraska law, differing from Iowa law, run to the thread of the contiguous stream." 406 U.S. at 123, 92 S.Ct. at 1383, 31 L.Ed.2d at 738. Included therein are titles obtained by ten years open, notorious, and adverse possession under claim of right without any requirement of a record title. Under Iowa law a claim must be under "color of title" requiring some type of record title to commence the period of adverse possession.

 Our de novo review leads us to the same conclusion reached by the trial court— that by 1943, the date of the Nebraska-Iowa boundary compact, the defendants

had titles good in Nebraska under the Nebraska law of adverse possession. Possession was established commencing with defendant Fred Walker's grandparents, who moved onto the island in 1930 and constructed a dugout in which to live. Thereafter, defendant's grandparents and the defendant Fred A. Walker himself resided on the island continuously from 1932 through 1943. They built a dugout in 1930, a cottonwood and plain lumber house in 1931, a log house in 1932, additions to the cottonwood house in 1933, a grain storage crib in 1941, and other farm-type buildings. They sowed sweet clover seed on all parts of the island, north to south, and east to west, in at least 1930, 1933, and 1935. They took horses, cows, hogs, chickens, ducks, and goats onto the island to use for various purposes. Between 1930 and 1943 they also took tractors, plows, rakes, and various other farm machinery to the island for purposes of farming the land.

During the years 1930 through 1943, the defendants cleared portions of the island with corn knives where it was the easiest to do so. At such times as were left to them, after spending time off the island helping to make a living, they cleared various patches of ground for gardening and crops. They planted and harvested garden produce and crops, primarily corn, in the years 1931 through 1943. In addition, they rented out the areas which had been seeded to sweet clover for pasture to individuals, whose livestock the defendants brought to the island for that purpose. During the 1930's and 40's, the defendants rented hunting blinds and allowed people to hunt and fish on the island. They took live decoys to the island and acted as guides for duck hunters.

Possession of the island by the defendants was hostile and under their claim of ownership. The predecessors in interest of defendant Fred A. Walker, in an effort to retain every control over the land in dispute and to prevent anyone from interfering with their exclusive dominion over the land, paid taxes to the State of Missouri. The defendants' possession and occupancy of the island was exclusive in that no other people lived on the island, came to the island without permission, or exercised any dominion thereover. The island flooded each year during the years 1945 through 1952 and was, therefore, unsuitable for animal husbandry or the planting and harvesting of crops. After 1943, and before 1955, none of the defendants lived on the island, but they continued to exercise dominion over it during those years, and returned to the island to assure themselves of the exclusiveness of their possession at least twice annually during that period of time.

We note the case of *Pettis v. Lozier,* 205 Neb. 802, 290 N.W.2d 215, 217 (Neb. 1980), in which the court said, "One who claims title by adverse possession must prove by a preponderance of the evidence that he has been in actual, continuous, exclusive, notorious, and adverse possession under claim of ownership for a full period of 10 years." The continuous adverse possession does not require a continuous occupancy by someone living on the land all of the time; nor is the use and occupation requisite to the protection of such title necessarily a constant use. *Walker v. Bell,* 154 Neb. 221, 47 N.W.2d 504, 506 (Neb.1951).

In 1955, defendant Fred Walker returned to live on the island from that time forward. He commenced to reclear the island in 1955. The occupancy, possession, clearing, raising of crops, husbandry of livestock, claim to ownership, and continuity of occupation of the island by the defendants was corroborated by the brother of Fred A. Walker, Don Walker, old-time resident Claude Oakes, old-time resident Leonard Anderson, Otoe County, Nebraska, Treasurer Henry E. Schemmel, and long-time resident Bob Case.

After July 12, 1943, when Walker-Engleman Island was ceded to the jurisdiction of the State of Iowa, defendant Fred A. Walker tried to pay taxes on a portion of Section 8, i.e. the portion of Walker-Engleman Island lying north of a westerly extension of the Iowa-Missouri State Line; to Fremont County, Iowa, and was informed that he would not be allowed to do so. In 1961, defendant Fred A. Walker succeeded to the

interests of the remainder of his family, the successors to the adverse possessors of Walker-Engleman Island from 1930 to 1943, by Warranty Deed, which he filed of record with the Fremont County, Iowa, Recorder, the land then being subject to the jurisdiction of the State of Iowa.

The Smith defendants' claim rests on the validity of defendant Walker's claim since Smith claims to have adversely possessed a portion of the island from Walker. We find that Walker has accepted Smith's claim.

The claim of defendants Woods and State Line Farm Co. is based on accretion of land to the high bank of lands titled in them. We find their claims are established.

■ Plaintiff's claim that the island attached to the bed of the stream which Iowa owns fails because by 1943 defendants had established their nexus with Nebraska and their titles by adverse possession and accretion to the lands possessed. Pursuant to the Compact, these lands were then ceded to Iowa as titles good in Nebraska.

■ Defendants and their predecessors have been in possession of these lands for over forty years. During this period they have steadily cleared the land, made improvements thereon and farmed it. Expenditures have been made by them in reliance on their ownership. Even after the Nebraska-Iowa Compact of 1943, plaintiff did nothing to establish its ownership until this suit was filed in 1963. From 1964 this case was stayed pending the outcome of *Nebraska v. Iowa,* which was decided by the U.S. Supreme Court in 1973. From time to time thereafter the case was continued on motions of both plaintiff and defendants. Even the State of Iowa must pursue its claims with reasonable diligence. The doctrine of estoppel by laches has been applied against the State as long ago as 1914 in a claim to a land area designated Boyer Lake which was caused by the flow of the Boyer River and by waters of the Missouri River of which its was an arm. *State v. Livingston,* 164 Iowa 31, 41, 145 N.W. 91, 94 (1914). In *Livingston* the defendants had established title by a quiet title action against Pottawattamie County and property owners surrounding the land in dispute. The State was not a party to this action. For over ten years defendants used this land for purposes of husbandry and improved it with fences. The *Livingston* court concluded: "We think that after permitting these many years of uninterrupted enjoyment of the property in question, under claim of right, the state, had it the the right to sue, should not now be permitted to disturb it...." *Id.* We hold plaintiff's claim in the instant case is also barred by the doctrine of estoppel by laches.

Plaintiff's complaint that defendants caused an unnecessarily lengthy appendix is without merit, given the nature and complexity of this action. Costs are assessed against plaintiff.

AFFIRMED.